[Crim. No. 17654. First Dist., Div. One. Mar. 13, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE EARL RODGERS, Defendant and Appellant.

**COUNSEL**

Coker & Little, John Diaz Coker and Tina Masters for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ELKINGTON, J.**—Defendant Willie Rodgers appeals from a judgment based upon a jury's verdicts convicting him of forcible oral copulation (Pen. Code, § 288a) and burglary (Pen. Code, § 459).

We summarize the relevant evidence as it was presented at the trial.

The victim of the charged offenses was one Olivia, a 17-year-old emotionally disturbed black girl who was undergoing treatment at a publicly operated rehabilitation center. Rodgers, a black man well-known to Olivia, was employed by the center as a houseparent of a residential unit occupied by emotionally disturbed boys. Olivia had been assigned to a room of a "co-ed" unit some distance away. One evening while she was heavily medicated a black man entered her room and forced her to copulate his penis. The female houseparent of the unit observed Rodgers leaving the unit from the direction of Olivia's room. Soon after, the door of Olivia's room opened and she exclaimed that she had been "raped." She could not, or at least did not, identify her attacker. When her houseparent suggested that it was "Sonny" (the nickname by which Rodgers was known) Olivia replied, "Oh no, not Sonny. We're so tight." A police investigation disclosed Rodgers' fingerprints on or near a malfunctioning latch of the window of Olivia's room. Rodgers was arrested and charged with the sex offense and with the burglary resulting from his entering the room with the requisite intent to commit a felony. At Rodgers' trial Olivia positively identified him as her attacker. She also testified that when questioned by the police following the criminal incident she told them that Rodgers was the offender; this was denied by the police officers who had responded to the scene. But for her trial testimony, there was no evidence whatever that Olivia had been able at the time to identify her attacker. At the trial Olivia explained that she "became sure" that Rodgers was the culprit when she "had time to look over the descriptions, read over the preliminary trial papers [and] I've had time to think."

Other evidence at the trial indicated that Olivia's houseparent, who had identified Rodgers as the person who came out of Olivia's room at the time, entertained a strong *animus* toward him. She had accused him of causing her to be disciplined by loss of a week's pay (an accusation apparently conceded by all as true) and had said, "If it's the last thing I do, I'm going to fix Sonny Rodgers."

In respect of the fingerprints near the latch of Olivia's window, evidence was produced by Rodgers that he had, before the incident at issue, attempted to repair the defective piece of hardware.

Rodgers did not testify at his trial. He had previously been convicted of the felony of receiving stolen property.

■■ We find merit in Rodgers' contention of prejudicial misconduct on the part of the prosecutor, Mr. Flippen. As a result of that the judgment must be reversed.

Such misconduct pervaded the trial. We select some highlights from the prosecutor's jury argument. "[Y]ou have to pause and you have to say, is Mr. Rodgers here because he's not guilty?" "In fact, as you well know, most people go through their lives without being accused of anything"; "if you have any doubts about the case, I want you to ask yourself this: Knowing what you know now, would you want him to babysit for your teenage daughter, huh?" (Speaking of defense testimony) "That's a lie. . . . She's trying to cover for him. I'm convinced of that."

Such insinuations—that because the accused is "here" in court, he must be guilty, that doubts of his guilt should be resolved against him because he appears unfitted as a babysitter, and that the prosecutor (representing a prestigious public office) is personally convinced that certain contested evidence is true—are to be roundly condemned.

■■ Just as grievous is what we find to be a blatant violation of the well-known rule of *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], proscribing prosecutorial comment on the failure of one criminally accused to testify on his own behalf. At the trial's start, on voir dire of the jury, the prosecutor speculated whether "Mr. Rodgers [would] decide to take the stand," and stated that if the trial produced an evidentiary conflict "all a person would have to say is, 'I didn't do it.' " And following Rodgers' failure to testify, in the prosecutor's jury argument he continued throughout with such comments as: "[N]obody who has testified here has told you that he didn't do it"; "Nobody has said Sonny Rodgers didn't do that to Olivia"; "Nobody told you that that didn't happen"; "nobody has told you . . . the act did not occur"; and, "nobody has even suggested that she voluntarily entered into these things." And then the prosecutor concluded: "*Simply because he exercises those* [Fifth Amendment] *constitutional protections* does not mean that

he's innocent, does not mean that you are supposed to find him not guilty." (Italics added.)

Generally the prosecutor's transparent misconduct was objected to, and generally the trial court appropriately admonished the jury or directed that the subject discussion be ended. Such shortcomings as there may have been in continued objections were cured by the provisions of Code of Civil Procedure section 647 (last sentence). And the prosecutor generally persisted in his misconduct despite the objections and the court's rulings.

We observe further that the People's appellate brief commendably makes no real contention that prosecutorial misconduct was not rampant at the trial. Instead it is argued that the case was not "closely balanced" (*People* v. *Ney*, 238 Cal.App.2d 785, 790 [48 Cal.Rptr. 265]), that the trial court's frequent admonitions cured any prejudice (*People* v. *Berryman*, 6 Cal.2d 331, 337 [57 P.2d 136]), that there was no " 'dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods' " (*People* v. *Beivelman*, 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913] [cert. den., 406 U.S. 971], and that in any event the misconduct was "harmless" (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243] [cert. den., 355 U.S. 846 (2 L.Ed.2d 55, 78 S.Ct. 70)]). We are told, "Viewed together with these principles, each of [Rodgers'] assignments of misconduct is either insubstantial or nonprejudicial."

We disagree.

We conclude that as a result of the prosecutor's reprehensible conduct, Rodgers was denied the fair trial guaranteed him by the due process clauses of the federal and state Constitutions. (See *Estes* v. *Texas*, 381 U.S. 532, 540 [14 L.Ed.2d 543, 548-549, 85 S.Ct. 1628]; *Powell* v. *Alabama*, 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]; *People* v. *Lyons*, 47 Cal.2d 311, 319 [303 P.2d 329].) It is idle for us to speculate whether the prosecutor's conduct resulted from ignorance of the law and his official duties, or was a "dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods." Under either circumstance the *unfair* trial and the resultant conviction and punishment of the accused is an outrage, and the insult to our system of criminal justice, intolerable.

"Fewer judgments would have to be reversed if the trial courts were more firm in controlling the comparatively few prosecutors who need restraint." (*People* v. *Ford,* 89 Cal.App.2d 467, 472 [200 P.2d 867].)

The judgment is reversed.

Racanelli, P. J., and Newsom, J., concurred.