[Crim. No. 33322. Second Dist., Div. Five. Aug. 9, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE LOUIS ORTIZ, Defendant and Appellant.

928

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, Harold E. Shabo and Robert Scarlett, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—This appeal follows a conviction of voluntary manslaughter (a violation of Pen. Code, § 192). The claimed error is prosecutorial misconduct.

Defendant was charged with murder (a violation of Pen. Code, § 187). Trial was by jury and the verdict followed four days of deliberation.

A commitment of defendant was made to the Department of Corrections for diagnostic observation pursuant to Penal Code section 1203.3. On return, a sentence was pronounced placing defendant on 5 years probation conditioned upon defendant spending the first 365 days in county jail.[1] Credit was given toward the jail period of 260 days already served.

### STATEMENT OF FACTS

Martha Medina was from Cuba and had met and married Bienvenido Medina in Miami. They came to Los Angeles and there met the defendant. The acquaintanceship had been for some six years at the time of the events in question.[2] Martha was both of the Catholic faith and a member of an African religion in which animals were sacrificially slaughtered. Defendant was also a member of this African religion and it was he (among others) who would slaughter the sacrificial animal. Defendant used a particular type of knife and a particular style of modus operandi in the killing and Martha had observed defendant and his knife perform many times.

Just what happened on the night Bienvenido was killed was pictured by defendant and by Martha; their stories varied considerably. To summarize, it appears that on the night in question Bienvenido and Martha were having some problems; Bienvenido had hidden Martha's car. Martha called defendant and asked him to meet her at a nearby service station. Martha testified she wanted to go looking for her car. As defendant arrived at the station in his car, Bienvenido also drove in. The two parked near each other. Bienvenido exited his car and told Martha he would take her to her car. The defendant approached Bienvenido and, though the open car door prevented her observation, she saw defendant do something with his hand and Bienvenido immediately got into his car. As Bienvenido drove off, defendant said, "I stabbed him." He placed a knife on the car seat and there was blood on the knife. Martha recognized the knife as the one defendant used in the sacrificial ritual. Defendant and Martha followed Bienvenido to a hospital where he crashed into a grating at the entrance. Martha ran to her husband and observed him

---

[1] There were other conditions not necessitating listing here.

[2] In addition, the record establishes a romantic involvement between the two.

·slumped over the steering wheel. Bienvenido said defendant had stabbed him and Martha saw the blood from the stomach area. Bienvenido was hospitalized and died September 8th from the wound inflicted August 13th. It was established that the knife which had been used had a blade of eight to ten inches in length and this corresponded to the type of sacrificial knife used by defendant.

The defense consisted of self-defense and that Bienvenido was the one with the knife and was stabbed during a struggle.[3]

The gravamen of Ortiz' appeal is his objection to the prosecutor's questions regarding the religious cult to which both he and Martha belonged.[4]

To understand the gravamen of the issue we necessarily set forth the questioning:

"Q. [Deputy District Attorney]: In Cuba did you belong to a religion?

"A. [Martha Medina]: For example?

"Q. Did you belong to some sort of a religion, a cult?

"A. Well, the Catholic one, the one that we have always been members of.

"Q. What is the name of that religion?

"A. Of the Catholic religion, and African.

"A. Is there a name for that?

---

[3]Incredible as it may sound, no one asked defendant if he had a knife that night.

[4]The trial judge originally instructed the prosecutor to avoid questions regarding the cult, and asked her to confine her questions as to whether defendant possessed a knife similar to that used in the killing. The prosecutor, nevertheless, proceeded to question Martha about the animal sacrifices.

"[Defense counsel]: There will be an objection, your Honor, to that.

"THE COURT: Approach the bench, please, with the reporters. [¶] (The following proceedings were held at the bench out of the hearing of the jury:)

"THE COURT: What is the objection?

"[Defense counsel]: The objection would be immaterial and irrelevant what her religion was in Cuba.

"THE COURT: I'm inclined to agree with you.

"[Deputy District Attorney]: It's very relevant, Your Honor, because it goes to malice aforethought, it's going to go to possession of the weapon before and at the time. [¶] Both she and the defendant belong to this religion where she was a Santero—S-a-n-t-e-r-o—. [¶] The defendant is coming up in the cult, and he was quote the butcher, and the Santeros has a place in their houses where they have these, and makes sacrifices."

"·  .   .   .   .   .   .   .   .   .   .   .   .   .   .   ".   .   .   .   .   .

"Q. As part of this religions [*sic*], were animals sacrificed or butchered?

"A. Yes.

"·  .   .   .   .   .   .   .   .   .   .   .   .   .   .   ".   .   .   .   .   .

"Q. As part of that religion did the defendant kill animals?

"A. After they were killed he would open them up.

"Q. Where did this happen?

"A. We had where we did the consecrations at the house of a Santero.

"Q. What kind of animals?

"A. Goats, lambs. Those are the types of animals we killed.

"Q. Did the defendant have anything special that he used to open these animals?

"A. Well, they were opened up with knives that were dedicated for that.

"Q. What did these knives look like?

"A. Well, there were different types of knives that we used for killing.

"Q. Well, were they any kind of knife or—

"A. Each one had the knife of their own choice.

"Q. Did you see the defendant with such a knife?

"A. Yes.

"Q. Where?

"A. Well, when he opened up the animals, I would see him with the knife.

"·  .   .   .   .   .   .   .   .   .   .   .   .   .   .   ".   .   .   .   .

"Q. And when he would get this knife, when would he get it, do you know?

"A. When we had the sacrifices, he would be called to open animals.

"Q. Who would, who would call?

"A. Well, the Santero who would do the sacrifices.

"Q. Do you have the sacrifices on certain days, or when one came up, did the Santero just call him?

"A. It was almost always on the weekends.

"Q. How long beforehand would you know that this was to happen?

"A. What? That what was going to happen?

"Q. There was going to be a sacrifice.

"A. We would always let people know beforehand, a week before.

"Q. When the animals were opened up by the defendant, how were they opened up?

"A. Open them from the bottom to the top.

"Q. What do you mean, from the bottom to the top?

"A. Well, instead of opening from the top, we would open them from the bottom.

"Q. Was that on the underside of the animal as opposed to the top of the animal?

"A. Well, in the middle.

"Q. Was the animal on his back, and then from the bottom up to the neck?

"A. He was opened up with his feet like this, then he would be opened up from the bottom to the top.

"Q. His feet were spread apart, so we are talking about the underbelly, up.

"A. Well, yes. To open up the animal, first we would take the hide off, the skin, and then after we took the hide off, they would be opened.

"[Defense counsel]: Excuse me. There would be an objection at this time. I believe this whole line of questioning is irrelevant and immaterial.

"THE COURT: Overruled.

Q. [Deputy District Attorney]: How many times did you see the defendant with this knife approximately?

"A. Well, the times that the Santero had called him and that I would go, I would see him.

"Q. So it was what, ten times, five times"

"A. Depending on when he was called. He would open them up also at my house."

" '[R]elevancy' is the first rule of the admissibility of evidence. . . ." (*Traxler* v. *Thompson* (1970) 4 Cal.App.3d 278, 286 [84 Cal.Rptr. 211].) Evidence Code section 210 defines " 'Relevant evidence' " as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

■ As far as evidence which is offered to prove an issue in the case, "[t]he general test of relevancy of indirect evidence is whether it ,tends logically, naturally, and by reasonable inference to prove or disprove a material issue." (*People* v. *Jones* (1954) 42 Cal.2d 219, 222 [266 P.2d 38].) ■ The instant case presents no issue upon which the details of the animal sacrifice would be relevant. They do not tend to establish any material fact for the prosecution nor to overcome any material matter sought to be proved by the defense. (*People* v. *Kelley* (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947].)

Plaintiff's reliance upon *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], is misplaced. In *Manson* the court held that it was proper to present evidence of the defendant's preachings to his followers that they should kill people in order to foment a revolution. Such exhortations exhibited knowledge of a common plan or scheme. (*Id.,* at pp. 139-140.) Although the prosecutor seemed to indicate that she would uncover such a common design among the members of the cult—"Her statement is going to be that it's bad, the people out here are bad, and part of it is killing the people, . . ." —in response to a question from the bench as to the relevancy of her line of questioning of Martha regarding the cult, no such sinister purpose of the cult was ever shown or even suggested.

The prosecutor rightfully offered evidence that Ortiz was generally in possession of a knife similar to that believed used in the slaying.[5] However, any further evidence regarding his religious practices was irrelevant and should have been excluded as prescribed by section 350 of the Evidence Code.

The second inquiry into relevancy is whether it tends to attack the credibility of a witness or a hearsay declarant. (Evid. Code, § 210.) The prosecution's questioning of Martha regarding the animal sacrifices, although irrelevant to any issue in the case, is argued to be relevant to

---

[5]The victim was killed by a knife with a long blade similar to that described by Martha as the sacrificial knife. The actual weapon used in the killing was not found.

attack the credibility of Ortiz and his version of the incident. (See Jefferson, Cal. Evidence Benchbook (1972) § 20.7, p. 250, citing *People* v. *Pierce* (1969) 269 Cal.App.2d 193 [75 Cal.Rptr. 257].) ■ We need not examine this proposition for assuming arguendo that such evidence was relevant to impeach the testimony of defendant; its relevancy was certainly outweighed by its prejudicial effect. Evidence Code section 352 allows the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In considering the effect of the prosecutor's statements, we must consider not only the direct effect of the statements because of what they say, but also any indirect effect that they might have had because of the way in which they were presented. (*People* v. *Gonzales* (1967) 66 Cal.2d 482 [58 Cal.Rptr. 361, 426 P.2d 929].) The prosecutor's continued reference to the animal sacrifices had to have the effect of creating a negative image of defendant in the minds of the jury. ■ ■■■ In her closing argument, the prosecutor painted a picture of Ortiz as a man who could no longer distinguish between animals and people.[6]

"The victim . . . and his wife . . . had come out from Florida, and it appears that she had been in this cult, or religion even before she came over to the United States from Cuba. [¶] Coming out here to California they, as would be expected, found other people that were in the same type of cult, or same type of religious order, or whatever it was. . . .

"The wife, Marta [*sic*], met the defendant . . . while he was opening the animals. . . .

"[W]e . . . know . . . the defendant had to go to some sort of a ritual . . . in order to learn how to use this big knife with a silver handle, a big knife that he opened the animals with, . . . [¶] it was used when one of the anteros [*sic*] would call him, and she said it was early on the weekends, 'We are going to sacrifice,' you know, 'come with the knife.'

[6]Defense counsel failed to object to the prosecutor's closing argument at trial. However, there are exceptions to the general rule that a failure to object at trial waives the right to object on appeal. Where a case is closely balanced such as the instant case and the prosecutor's acts of misconduct are such as to contribute materially to the verdict, the right to raise these issues on appeal are not waived by a failure to object at trial. (*People* v. *Perez* (1962) 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136].) In any event, the prosecutor's remarks were of such a character that a harmful result could not have been obviated or cured by any retraction of counsel or instruction of the court.

"So it is not news that the knife was hidden, this special knife that is consecrated to killing the animals and having them opened.

"I guess it just doesn't matter anymore whether it was a human being or an animal."

The questioning of a defendant on collateral matters with no apparent purpose other than to degrade him, has been held to be reversible error under certain circumstances. (*People* v. *Watson* (1956) 46 Cal.2d 818, 834 [299 P.2d 243].) The case of *People* v. *Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396], is the latest analysis of prosecutorial misconduct. The case before us fits squarely within the prohibition criticized in *Bolton* where the court said (at p. 212): "There is no doubt that the prosecutor's statement constituted improper argument, for he was attempting to smuggle in by inference claims that could not be argued openly and legally. In essence, the prosecutor invited the jury to speculate about—and possibly base a verdict upon—'evidence' never presented at trial. Appellant, in fact, had no prior criminal record. [¶] Closing argument presents a legitimate opportunity to 'argue all reasonable inferences from evidence in the record.' (ABA Standards, The Prosecution Function (1971) std. 5.8(a). . . .) However, this court has for a number of years repeatedly warned 'that statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.' (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 724 . . . ; see also *People* v. *Taylor* (1961) 197 Cal.App.2d 372, 381-384. . . .)"

█ In order to find reversible error, we must reweigh the evidence and determine whether it appears reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Watson*, *supra*.) Any such substantial error which tends to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial. (*People* v. *Briggs* (1962) 58 Cal.2d 385 [24 Cal.Rptr. 417, 374 P.2d 257].)

We find the conduct of the prosecution to be highly prejudicial to the defendant and that this case presents an example of circumstances requiring reversal. Applying the test as stated in *Beagle* and *Watson*, we are of the opinion that it is reasonably probable that the jury may have believed Ortiz' theory of self-defense had the prosecutor not engaged in the misconduct of which Ortiz complains. Such prosecutorial misconduct

requires reversal of the conviction of voluntary manslaughter. (See *People v. Rodgers* (1979) 90 Cal.App.3d 368 [153 Cal.Rptr. 382].)

The judgment is reversed.

Kaus, P. J., concurred.

ASHBY, J.—I respectfully dissent. The question of ownership of the knife which was used to kill Bienvenido was crucial. The testimony of Martha that the knife used belonged to defendant directly contradicted defendant's claim that the victim had the knife and that defendant had disarmed him, acting in self-defense. The evidence of the religious practice in which the knife was used was not irrelevant. The testimony concerning defendant's participation in the religious sacrifice of animals had the effect of enhancing Martha's credibility in that it showed that she had many opportunities to view the knife and was very familiar with its use. Thus she was not likely to be mistaken regarding its ownership. (See Evid. Code, § 210.) The damaging effect of Martha's testimony was not the disclosure of defendant's religious practices but rather the fact that the knife used to kill the victim was defendant's own weapon. It is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the alleged misconduct of the prosecutor.

A petition for a rehearing was denied September 7, 1979, and respondent's petition for a hearing by the Supreme Court was denied October 4, 1979.