[Crim. No. 22221. First Dist., Div. One. May 27, 1981.]

In re GEORGE CANDIA RODRIGUEZ on Habeas Corpus.

[Crim. No. 19864. First Dist., Div. One. May 27, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE CANDIA RODRIGUEZ, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Dennis P. Riordan and Neil Rosenbaum, Deputy State Public Defenders, for Petitioner and Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Richard Tullis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GRODIN, J.—Appellant was convicted of rape (Pen. Code, § 261, subds. 2, 3); robbery (Pen. Code, § 211); and kidnaping (Pen. Code, § 207); and with the use of a dagger in the commission of the first two offenses (Pen. Code, § 12022, subd. (b)). On his appeal, he contends that numerous instances of prosecutorial misconduct by the district attorney combined with "inappropriate conduct" by his defense counsel deprived him of his constitutional right to a fair trial. In addition, he ascribes error to the introduction of certain "expert" testimony and the failure of the trial court to give certain instructions. His claim of inappropriate conduct by his defense counsel is buttressed by a petition for writ of habeas corpus, accompanied by declarations. We issued an order to show cause on the petition, and the two matters were argued together.

The case is an unusual one, for reasons which will appear. The issues presented protrude to some extent beyond established categories of analysis. We will examine appellant's principal contentions in light of the record and then proceed to an overall evaluation.

The factual background relevant to analysis of the issues on appeal can be summarized briefly. According to prosecution evidence the victim, Mrs. C., was driving home from a party late in the evening on December 14, 1978, and had stopped at an intersection in San Jose, when someone entered the passenger side of her car, threatened her with a knife, ordered her to stop the car in front of the Terry Hotel on San Carlos Street, and assaulted her sexually. To the "best of [her] knowledge" there was penetration, but she was not certain. Mrs. C. drove home, where her husband discovered that a borrowed mink stole she had with her in the car was missing. Mrs. C. was taken to the hospital for examination, and then to the police station, where she provided the police with a description of her assailant. The description resembled her husband, including the clothing he was wearing earlier that evening. On December 16, 1978, appellant had a conversation with a friend, in the course of which he mentioned he "got" his wife a mink stole for Christmas. Another friend, Raymond Pulizzi, testified that appellant bragged to him about raping a woman at knifepoint and stealing her mink stole. These conversations led to appellant's arrest. Mrs. C. was unable to identify appellant from photographic or physical lineups, but she was able to identify appellant's knife. An expert testified at the trial

that semen stains found on Mrs. C.'s pantyhose were "consistent" with appellant's biological characteristics. Appellant did not testify.

### APPELLANT'S CONTENTIONS IN LIGHT OF THE RECORD

*Alleged Prosecutorial Misconduct*

Appellant contends that the prosecutor engaged in numerous instances of prosecutorial misconduct, including comments in his argument to the jury on appellant's failure to testify, introduction of "irrelevant and highly inflammatory evidence" relating to what transpired at the preliminary hearing, and improper examination of witnesses Lockwood and Wong. We consider the contentions in that order.

1. *Comments relating to appellant's failure to testify.*

During his opening argument to the jury the prosecutor observed that all the evidence presented pointed to the defendant's guilt, and then said, "Now, you can't stop and think, you can't say because he didn't testify he must be guilty, you can't do that. You can't hold that against him. And the Judge is going to instruct you to that effect, and it's something that can't enter into your deliberations at all. You can't say, gee, if I were guilty or not guilty, I would have testified, I would have done this or that. It's against the law for you to do that. [¶] But on the other hand, you can't engage in possibilities and speculation. You are stuck with the evidence that you have in this case." He then went on to assert, "all the evidence you have is that he did do it and there is no evidence that he didn't."

During his closing argument, the prosecutor said: "All right. The evidence is for you to determine, and I would submit to you that I feel it's absolutely undisputed that there was a kidnap, absolutely undisputed. Where is that disputed? Where is the evidence that there wasn't a kidnap? All the evidence that you have is that there was. [¶] Now, you are not allowed to hold against the defendant the fact that he did not testify. But there is nowhere in those instructions and the law isn't that you have to make up a defense for him. You are stuck with the evidence you have here. The evidence in this trial is that there was a kidnap, in my opinion, based upon the same evidence you heard. That's the only interpretation of the evidence. There is no evidence on the other side. It's as simple as that."

Appellant contends that these statements constitute comments by the prosecution on the accused's silence in violation of the rule in *Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1797], and its progeny. He concedes that the statement, "all the evidence you have is that he did do it and there is no evidence that he didn't," is a permissible comment on the state of the evidence (*People* v. *Berthea* (1971) 18 Cal.App.3d 930 [96 Cal.Rptr. 229]), but he argues that the statement, "it's absolutely undisputed that there was a kidnap," in the prosecutor's closing argument was impermissible because it connoted a lack of personal response by the accused himself. (*People* v. *Vargas* (1973) 9 Cal.3d 470 [108 Cal.Rptr. 15, 509 P.2d 959]; *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133]; *People* v. *Rodgers* (1979) 90 Cal.App.3d 368 [153 Cal.Rptr. 382].) And he argues that the prosecutor's repeated admonitions to the jury that it should draw no adverse implication from the accused's failure to testify impermissibly called the jury's attention to that failure.

2. *Attack on conduct of defendant and defense counsel at the preliminary hearing.*

During his direct examination of Mrs. C., the prosecutor interrupted a line of questioning directed toward identification of her attacker to ask, "Do you recall the defense attorney's blowing kisses to you at the preliminary hearing?" When she answered, "Yes," the prosecutor asked, "Did that upset you?", to which she replied, "Made me feel very cheap. And it did upset me, yes." There was no objection.

On cross-examination, defense counsel interrupted *his* interrogation to inquire of Mrs. C., "Is there any reason you keep looking at Mr. Kennedy [the prosecutor]? A. No. Q. Is it necessary? Is he giving you any indication with his eyes or anything as to— A. No. Q.—responses? A. Why does it bother you that I look at Mr. Kennedy? Does that bother you? Q. It doesn't bother me. It is my job to represent Mr. Rodriguez, who has a lot more to suffer at your hands than you do at mine, my dear."

Later, the prosecution called Dr. Diana Everstine, a psychologist, to testify as an expert on the reactions of women to rape. On redirect examination, the prosecutor asked her whether she saw the defendant "doing anything" during the preliminary examination while Mrs. C. was testifying. The witness replied that she saw the defendant and Mr. Smallwood, one of defendant's cocounsel, "making obscene gestures,

faces, grimacing. At a particular time, Mr. Smallwood was turning to me in the audience and sticking his tongue out, blowing kisses. It was very vulgar." The witness also stated that *the defendant* was doing "[g]enerally the same thing: making cracks, laughing; particularly during the sexual aspect of the examination of Mrs. C." The prosecutor then asked what Mr. DeVilbiss, defendant's other cocounsel, was doing during that time. At this point, Mr. Smallwood objected on the grounds of relevancy, and the objection was overruled. The examination continued: "Q. Was Mr. DeVilbiss touching Mrs. C.? A. Yes. At one point he did touch her. Q. Was he touching her very close to the breast area as he was examining her concerning where the knife was held, for example? A. Yes he did. And it was very inappropriate."

On recross examination, defense counsel Smallwood asked Dr. Everstine whether it was not the case that she was signaling Mrs. C. during the preliminary hearing as to what answers she should make, and the witness denied doing so. Defense counsel then asked why Mrs. C. looked at the witness during the hearing, to which the witness replied, "In the beginning she didn't. But afterwards, with all this stuff that was going on, she was so upset that I suggested it."

Several days later, the defense moved for a mistrial on the ground that Dr. Everstine's testimony concerning the preliminary hearing had been inflammatory and highly prejudicial, and the motion was denied. The court stated: "I think the issue was created by the questions of your own co-counsel and what was said with respect to why she didn't look at him or them or you. Under the circumstances, I think the questions were proper and you had an opportunity to cross-examine her, which you did, number one; and, number two, you didn't raise the objection at that time."

The following day, defense counsel called as rebuttal witnesses Judge Taylor, who presided at the preliminary hearing, and the court reporter who transcribed it. Judge Taylor testified that he could not recall what occurred, and the court reporter testified that she saw no obscene gestures but heard "snickering, some laughing and chuckling."

Appellant contends that the evidence submitted by the prosecution was "utterly irrelevant and highly inflammatory," and that its only possible probative effect was to discredit appellant's counsel and taint appellant's character before the jury.

### 3. *Examination of witnesses Lockwood and Wong.*

Officer Robert Lockwood, the arresting officer, was called as a witness by the prosecution. On cross-examination, defense counsel asked him whether Mr. Kennedy, the prosecutor, indicated to him "any of the offers he made to the defense with respect to resolving this case," to which Officer Lockwood replied that he was not aware of any offers. On redirect examination, the prosecutor asked Officer Lockwood, *"Have you ever heard a defense attorney try and fish something out that will cause a reversal later?"* (Italics added.) The defense attorney, Mr. DeVilbiss, interrupted to say, "May the record—Your Honor, I have never appealed a criminal case in my life. If he's referring to me, I want the Court to know that." The court then stated: "My only concern at the moment is to rule on objections. I have heard no objection at this point. Anything further?" Both counsel responded that there was nothing further.

Denise Wong, a criminologist, was called by the prosecution to testify regarding the semen stains found on the clothing of the prosecuting witness. On cross-examination, she admitted that she could not say, based upon her examination, "that those semen stains were deposited beyond a reasonable doubt and to a moral certainty by Mr. Rodriguez." On redirect examination, the following ensued: "Q. When you say that, are you aware of facts such as he confessed to one of his friends, one of his friends told his girl friend, the mink coat that was taken during the rape was found at the house—Mr. Smallwood: Objection, Your Honor — Q. —that the knife that was used in the rape was found in his truck, and things like that?" The trial court sustained the objection, and admonished the jury that the witness could testify only with respect to her analysis and the results of that analysis.[1]

---

[1] Appellant submits that the prosecutor's "antics" constituting misconduct included his insistence on pursuing lines of questioning to which objections had been sustained. The record reflects that on one occasion the prosecutor asked the prosecuting witness whose idea it was that she see Dr. Everstine. Defense counsel objected on grounds of relevancy, and the objection was sustained. Despite that ruling, the prosecutor then asked, "Was that your idea?" Further objection produced admonishment from the court.

On one occasion, after the jury was excused, defense counsel accused the prosecutor of falsely representing that no blood sample had been taken, and the prosecutor called him a liar. On another occasion, with both counsel present in chambers, the court asked the prosecutor to play back a tape which had been partially played in the presence of the jury. The prosecutor said, "No, I am not going to move it back to where it was played...." The court: "Don't tell me you are not going to play it back if I order you to move it back." The prosecutor then apologized.

*Alleged Misconduct by Defense Counsel*

Appellant's argument based upon his own counsel's misconduct transcends typical claims of incompetence. He argues that various improprieties on the part of his counsel compounded the misconduct of the prosecutor, making a fair and objective evaluation by the jury impossible.

When trial commenced in this case, Mr. E. F. DeVilbiss and Mr. Francis Smallwood were defense counsel of record. DeVilbiss did not appear in court on Monday, May 21, 1979, the morning of the third day of trial testimony. Appellant agreed that the case might proceed in DeVilbiss' absence, with cocounsel Smallwood acting in his place. Smallwood learned when he returned to his office at noon that DeVilbiss "was feeling ill and had to go to the doctor." Smallwood informed the court that afternoon, *after* he had cross-examined three of the People's witnesses (including Dr. Everstine and Denise Wong, the police forensic scientist), that he "wasn't prepared to make the opening statement or closing argument" for the defense. He requested a continuance for one day, and the proceedings were continued until Wednesday, May 23.

On Wednesday, DeVilbiss "was still ill." Smallwood represented to the court that DeVilbiss was "unable to proceed with this case and has advised me to be prepared to proceed with the case, and I'm so prepared." Appellant consented to the substitution of counsel, and trial was continued until Thursday, May 24, when Smallwood called his rebuttal witnesses, including Judge Taylor, in an effort to contradict Dr. Everstine's testimony concerning defense counsel's inappropriate behavior at the preliminary hearing.

On Friday morning, May 25, Smallwood represented to the court that DeVilbiss, although still "incapacitated," would "be ready, willing, and able to argue the case on Tuesday," May 29. The jury was dismissed until Tuesday.

On Tuesday morning, appellant consented to have DeVilbiss make the closing argument. Smallwood and DeVilbiss requested "a few moments to exchange information" because they had "not been in touch with one another over the weekend." DeVilbiss made his argument and left before the prosecutor's closing argument.

Smallwood's declaration accompanying the petition for writ of habeas corpus contains the following assertions relevant to the events. Smallwood was admitted to practice on November 28, 1978. On January 1, 1979, he began working as an attorney with the Mexican-American Community Services Agency Law Clinic in San Jose. At that time DeVilbiss was the director of the law clinic. In January 1979, he appeared as cocounsel with DeVilbiss at appellant's preliminary hearing. It was his first preliminary hearing, and appellant's trial was the first trial in which he had participated. He and DeVilbiss agreed that because Smallwood had no experience DeVilbiss would conduct the trial, including voir dire, opening statement, examination and cross-examination of all witnesses, and closing argument. Smallwood was to assist on matters of law. When DeVilbiss did not show up for trial on the morning of May 21, appellant agreed that the trial would proceed with Smallwood as counsel. Rodriguez was not aware that Smallwood had no trial experience, and Smallwood did not tell him.

On the morning of May 23, DeVilbiss phoned Smallwood to say he did not intend to participate further in the trial. Smallwood told appellant that DeVilbiss was withdrawing from the case, but did not inform him of the possibility of moving for mistrial or requesting a further continuance to obtain an experienced trial lawyer. He assumed that because he was cocounsel of record he had no choice but to carry on alone.

Smallwood then proceeded to represent appellant when trial recommenced on May 24. On the evening of May 24, DeVilbiss agreed to return to make closing argument, provided the matter were continued to May 29. The trial court granted a continuance. Smallwood and DeVilbiss did not, however, consult about the trial during the intervening weekend and they discussed the evidence of 5 prosecution witnesses who testified during DeVilbiss' absence for no more than 10 or 15 minutes before he presented his argument to the jury.

Smallwood's declaration provides a possible explanation for DeVilbiss' behavior in this regard. Smallwood had been aware since January 1979 that DeVilbiss suffered from a serious illness. Between January and May 1979, he suffered frequent and prolonged coughing spells, and sometimes spat blood. He also appeared to be suffering from a great deal of stress and displayed angry and intemperate outbursts toward members of the clinic staff and clients. At Thanksgiving time in 1979,

DeVilbiss informed Smallwood that he had lung and lymph cancer. In November 1980 he died of cancer.[2]

In its return to the order to show cause on appellant's habeas corpus petition, respondent submitted a declaration from the prosecutor, who states that he had handled several other cases during a period of seven years in which DeVilbiss was opposing counsel, including at least one other trial, and that in each of those cases DeVilbiss acted in approximately the same boisterous manner as he acted in appellant's case. The prosecutor also asserted that both DeVilbiss and Smallwood "seemed to be working especially hard" on the case, and this "did not seem to be" Smallwood's first trial. The return did not otherwise contradict the factual assertions contained in the declarations submitted with appellant's petition.

### Expert Testimony Relating to Appellant's Credibility

Dr. Everstine, a psychologist and director of the emergency treatment center of Santa Clara County, testified that it would not be "unusual" for a rape victim to describe the rapist as looking like her husband, due to a phenomenon which psychologists term "object substitution." The following dialogue then occurred: "Q. [By prosecutor] *Have you discovered people that come to you as rape victims who actually turned out to be nonvictims when you work with them*? A. Well, there are two issues to deal with: One is a clinical issue that when someone has falsely

---

[2]Appellant, in a declaration which also accompanied the petition, asserts that he was taken by surprise when DeVilbiss left the trial, but felt he had to leave the running of his defense in the hands of counsel. He confirms that Smallwood did not discuss with him alternatives of a motion for mistrial or continuance, and claims that he would never have agreed to DeVilbiss representing him if he had known how seriously ill he was, or to Smallwood representing him· if he had any idea how inexperienced he was.

The declarations accompanying the petition for habeas corpus seek to supplement the appellate record in relation to allegations of misconduct by DeVilbiss. The record shows, for example, that during direct examination of Mrs. C., DeVilbiss objected to a question, and although the judge sustained the objection, DeVilbiss continued to object until he was told to sit down. As he sat down, he said, "I have obeyed Your Honor ... I have obeyed Your Honor ... I have obeyed, I sat down." Smallwood in his declaration asserts that he glanced at the jury and that "[t]he looks on their faces indicated that they thought Mr. DeVilbiss' behavior was outrageous and unseemly." Smallwood's declaration also states that just before noon recess that day, DeVilbiss became extremely upset about something, flew into a rage, kicked his feet against counsel's table, then stalked back and forth, violently waving his arms about and shouting. According to Smallwood, the members of the jury "shrunk back and down into their seats. They looked very frightened of Mr. DeVilbiss." Smallwood also asserts that DeVilbiss' behavior during the remainder of that day and the next was "strident and excessive" to an extent not fully reflected in the record.

accused somebody of rape, I have to deal with them as a psychologist, and *I also have to inform the authorities so that they will drop the charges against, you know, an innocent person.* Generally, they are people with family problems, they are paranoid, or they are hysterics; and most of them are very obvious." (Italics added.)

Defense counsel Smallwood did not object to the question or move to strike the testimony. The prosecutor later argued to the jury: "She said 'I was raped.' She told the doctor after it happened that there was penetration. She's been working with a psychologist. *The psychologist said 'I have no reason to disbelieve her. If I find, as I do sometimes, that someone's not being honest with me through our hypnosis and therapy and so forth, I call the police.'*" (Italics added.)

## DISCUSSION

■ Things happened in appellant's trial which simply ought not to happen in a fair proceeding. Whether characterized as prosecutorial misconduct, defense counsel misconduct, judicial error, or a combination of all three, the net result was that the trial was turned into something of a circus, complete with sideshows, disappearing acts, clowning, and tricks which could only divert the jury's attention from the serious business of determining guilt or innocence in accordance with proper standards. The record reflects an overzealousness on the part of the prosecutor which bordered upon, and at times crossed the border into, misconduct; similarly inappropriate conduct on the part of a senior defense counsel who, quite probably as a result of his suffering from a fatal disease, suddenly abandoned his client in the middle of trial to a cocounsel with no previous trial experience; and a trial court which, under these trying circumstances, clearly experienced difficulty in maintaining the trial on its proper course, despite valiant effort on its part.

The prosecutor's excursion into alleged misbehavior of defense counsel and defendant at the preliminary hearing is one example. Respondent seeks to defend that detour on the ground that Mrs. C. was too upset to look at defense counsel during cross-examination, and it was necessary to elicit testimony about her experience at the preliminary hearing in order to prevent the jury from mistaking her demeanor as an indication that she was being untruthful. The record shows, however, that the prosecutor introduced the "blowing kisses" incident on direct examination, before her credibility had been attacked, so that apart

from its propriety on other grounds the "rehabilitation" was premature. (See *People* v. *Sweeney* (1960) 55 Cal.2d 27, 38 [9 Cal.Rptr. 793, 357 P.2d 1049]; Witkin, Cal. Evidence (2d ed. 1966) § 1276, p. 1180.) Moreover, the subsequent testimony of Dr. Everstine, which attributed vulgar conduct to both defense counsel and to defendant at the preliminary hearing, could not help but prejudice the defense in the eyes of the jury.

The prosecutor's remarks to the jury concerning appellant's failure to testify is another example. While the jury *might* have understood the prosecutor's statement, "it's absolutely undisputed that there was a kidnap" to refer to the lack of defense evidence on that subject generally, rather than to appellant's silence, the opposite is also the case, and it is precisely for that reason that the Supreme Court has condemned the use of such ambiguity. (*People* v. *Vargas, supra*, 9 Cal.3d at pp. 476-477.) Moreover, the prosecutor's repeated admonitions to the jury that it should draw no adverse inferences from appellant's failure to testify, while literally nothing more than a restatement of appellant's constitutional rights, are likely in context to assume quite a different dimension. At the least, they are like the admonition, "don't think of an elephant": by reminding the jury repeatedly of the defendant's silence, their probable effect is to focus the jury's attention upon that very phenomenon. At the worst, they are like Mark Antony's speech in mock praise of Caesar's murderers: depending upon the tone and manner in which they are delivered, they convey a meaning precisely contrary to their literal import. If such admonitions are to be given, it is appropriate that they be given by the court, whose function is to maintain neutrality in the proceeding. Viewed in toto, the prosecutor's remarks constituted *Griffin* error, similar in nature to that which this court condemned as "blatant" in *People* v. *Rodgers, supra*, 90 Cal.App.3d at page 371.

The other examples of prosecutorial misconduct, while of lesser significance, tend to demonstrate the somewhat gladiator-like atmosphere which pervaded the trial. It is highly unlikely, for example, that an experienced prosecutor would be unaware of the impropriety of asking a police officer witness about his experience with defense counsel tactics, or an expert medical witness her opinion of the defendant's guilt based on the state of the evidence.

Dr. Everstine's testimony concerning her practice in dealing with "nonvictims" was clearly objectionable. Its only relevance to this case consisted in its implicit (and improper) expression of Dr. Everstine's

opinion regarding Mrs. C.'s credibility—a purpose demonstrated by the prosecutor's argument to the jury. The unfairness of allowing such testimony in appellant's case is underscored by the fact that the trial court earlier denied appellant's *Ballard* motion to have Mrs. C. examined by a psychiatrist in order to be able to *attack* her credibility.

We would have some reluctance in reversing appellant's conviction on the basis of the prosecutor's conduct alone or in combination with Dr. Everstine's credibility testimony. The evidence pointing to appellant's guilt was quite substantial. Moreover, defense counsel failed to object to the initial questioning of Mrs. C. regarding the blowing of kisses at the preliminary hearing; Mr. Smallwood's objection to Dr. Everstine's testimony on the same subject came rather late, and was based upon relevancy alone; and there was no objection at all to the prosecutor's remarks to the jury concerning defendant's failure to testify. (See *People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Defense counsel's objection to the improper question of Mrs. Wong was sustained, and the jury properly admonished. There was, as we have observed, no objection to Dr. Everstine's improper credibility testimony, or to the prosecutor's argument based on that testimony.

When the behavior of defense counsel is added to the picture, however, our reluctance disappears. It may be that the failure to object, by itself, would not constitute incompetence of counsel, cognizable on appeal, within the framework of *People v. Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859], though it is difficult to imagine legitimate tactical considerations in justification. And we accept, for purposes of analysis, the prosecutor's characterization of DeVilbiss' trial antics as more or less typical of his behavior. But the antics did occur, and on top of them it appears to be undisputed that DeVilbiss left the trial, without warning, in the hands of an associate who had no trial experience and whose sole function was supposed to be research and advice on matters of law; that the associate proceeded with the trial without advising appellant either that he was without experience or that there might be other alternatives; that while the associate performed well considering his lack of experience, he failed to assert obvious objections to potentially damaging testimony and argument; that DeVilbiss returned to argue the case to the jury after only a brief period of consultation with Smallwood regarding what transpired in his absence; and that he left immediately after that argument, never again to return. The fact that DeVilbiss was suffering from cancer at the time warrants sympathetic understanding; but the overall impact upon the jury of the

events we have described must have been bewildering. And, of course, the fact that DeVilbiss has since died removes the possibility of *his* providing any tactical explanation for what occurred.

Appellant was entitled by the due process clauses of the federal and state Constitutions to a fair trial. (See *Estes* v. *Texas* (1965) 381 U.S. 532, 540 [14 L.Ed.2d 543, 548-549, 85 S.Ct. 1628]; *Powell* v. *Alabama* (1932) 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]; *People* v. *Lyons* (1956) 47 Cal.2d 311 [303 P.2d 329]; *People* v. *Rodgers, supra*, 90 Cal.App.3d 368, 372.) He was also entitled by the Sixth Amendment of the federal Constitution and by article I, section 15 of the California Constitution to the assistance of "reasonably competent attorneys acting as diligent advocates." (*People* v. *Pope, supra*, 23 Cal.3d 412, 422, 425.) Finally, he was constitutionally entitled to remain silent, and to be free from adverse prosecutorial comment upon his silence. (*Griffin* v. *California, supra*, 380 U.S. 609.) In our judgment, he was denied all three of these constitutional rights, and we are not prepared to say that the combined errors were harmless beyond reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L. Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Moreover, as we said in *People* v. *Rodgers, supra*, 90 Cal.App.3d at page 372, "the *unfair* trial and the resultant conviction and punishment of the accused is an outrage, and the insult to our system of criminal justice, intolerable." We conclude that appellant's entitlement to a new, and fair, trial is compelling.

The judgment is reversed. The petition for writ of habeas corpus, having become moot, is dismissed and the order to show cause is discharged.

Racanelli, P. J., and Elkington, J., concurred.