[Civ. No. 11938. Third Dist. Feb. 9, 1970.]

WAYNE TRAXLER, Plaintiff and Respondent, v.
SIGNE M. THOMPSON, as Administratrix, etc.,
Defendant and Appellant.

**COUNSEL**

McGregor, Bullen & McKone, Bledsoe, Smith, Cathcart, Johnson & Rogers and Robert A. Seligson for Defendant and Appellant.

Edward P. Freidberg and Eugene C. Treaster for Plaintiff and Respondent.

## OPINION

**PIERCE, P. J.**—Defendant, administratrix of the estates of plaintiff's wife Doris and his stepson Dwight Clinton, appeals from a $50,000 judgment for plaintiff after a jury trial in his action for the wrongful death of his four natural children. The four children, ages 2, 5, 7 and 8, and their mother were among nine ocupants of a 1962 Rambler station wagon killed when the car veered off an elevated portion of U. S. Highway 99 near Merced and plunged into a field some 40 feet below. The other occupants of the car were Mrs. Traxler's three teenage children from a previous marriage and her brother, Gilbert Gallegos, age 33. One of the teenagers, 16-year-old Dwight, was unquestionably the driver at the time of the fatal accident. The automobile belonged to plaintiff and Mrs. Traxler jointly. The complaint set forth two causes of action: the first was against the estate of the wife for negligently entrusting the car to Dwight; the second was against the estate of Dwight for wilful misconduct towards his guests.

As far as the jury was concerned, however, it was made obvious that the actual defendant was State Farm Mutual Automobile Insurance Company.[1]

---

[1]The battle has long raged, particularly in automobile personal injury actions, as to when plaintiff's attorney may and when he may not inquire of a prospective juror whether he owns stock in any casualty insurance company. Such a question has validity to explore and reveal a possible financial interest which could produce a defense minded jury. Weighted against this is the danger of over-stressing the fact that an insurance company (and not a named defendant of perhaps obviously limited means) will be actually paying the award. This is a matter in which a jury is supposed not to be concerned and which it should put out of its collective mind. As a part of this weighting process a rule difficult to apply has evolved. So long as inquiry into the interest of a juror in casualty insurance is kept low-keyed and is made in good faith, it will be permitted. If, however, it appears the interrogator is actually playing upon the insurance company's financial resources as a basis for increasing the recovery, prejudicial misconduct exists. (See *Hoffman* v. *Brandt* (1966) 65 Cal.2d 549, 554 (NB fn. 2 on p. 554) [55 Cal.Rptr. 417, 421 P.2d 425]; *Swift* v. *Winkler* (1957) 148 Cal.App.2d 927, 930-931 [307 P.2d 666], hear. den.; 2 Witkin, Cal. Procedure (1954) Trial, § 12, pp. 1737-1738; *Stevenson* v. *Link* (1954) 128 Cal. App.2d 564 [275 P.2d 782]; cf. *Kroplin* v. *Huston* (1947) 79 Cal.App.2d 332, 336-337 [179 P.2d 575]; *Sweet* v. *Stutch* (1966) 240 Cal.App.2d 891, 893 [50 Cal.Rptr. 9]; *Causey* v. *Cornelius* (1958) 164 Cal.App.2d 269, 275 et seq. [330 P.2d 468]; 2 Witkin, Cal. Procedure (1954) Trial, § 47, subd. (b), p. 1775.) Here objection to such questioning was made before the commencement of the *voir dire* examination. Effectually the trial court gave to plaintiff's counsel carte blanche by the manner in which the objection was overruled. Counsel took full advantage of the invitation. Twenty-three of twenty-five jurors on the panel were asked about their interest in State Farm Mutual Automobile Insurance Company. One juror was questioned and answered as follows: "A . . . You asked earlier of one of the jurors if they have stock. I'm insured by All State. Q I'm only concerned with State Farm. A I mean State Farm, but I don't own stock in the company. It's a mutual company, so, basically, your policy is stock. Q You get dividends at the end of the year if they do better on their claims? A No, at least I haven't yet. Q Maybe they haven't been doing so well." The manner of questioning informed the jurors as clearly as it was

■ *There is no conflict in the evidence.* Plaintiff Wayne Traxler had married Doris in December 1953. As stated, their family consisted of their four children plus the three children of Doris by her previous marriage. The automobile involved in the tragic accident belonged to Wayne and Doris jointly. Wayne was 36 years old. The accident happened on September 4, 1964. Wayne is a staff sergeant in the United States Air Force. On August 4, 1964, he was sent to Thailand on a four-month assignment. He testified that prior to his departure he had discussed with Doris whether to allow the older children, 17-year-old Caroline and 16-year-old Dwight, to use the family car. Doris believed the children should get learners' permits; Wayne said he did not think they were old enough or mature enough. A subsequent discussion was held in which the two children participated. Wayne testified that in that conversation he said Dwight would probably speed on the freeway just as all boys do and that he did not want him to drive at night because of the lowering of depth perception. He also testified he had declined, before he left, to sign any permit applications for the children, but stated he would think it over in Thailand.

Wayne had not given Dwight driving instruction. He knew of none he had obtained elsewhere.

The permit applications, which had not previously been offered to him for signature, were mailed to him, and on August 8, 1964, he signed and returned them with a letter to his wife in which he indicated that he did not want the children driving on the freeway or at night or without a responsible adult in the car, preferably her. Dwight had signed his application on July 15, his mother on July 19. The permit was issued August 12.

Defendant introduced testimony of a neighbor and of a friend of Dwight and Caroline to show that Dwight had driven the family car while accompanied by his mother during the month of July. Rose Carstairs testified that Dwight took and passed a course in driver's education taught by her at Highlands High School in September 1963. The class did not involve actual or simulated driving but did cover the California Department of Motor Vehicles rules for drivers and general rules for good driving. On his second try, Dwight passed the objective test given license applicants in California. Included in the test was a question about driving when fatigued which Dwight answered correctly. The children were shown a film illustrating the

---

possible to do so without stating the fact in so many words that—as defendant's attorney put it—State Farm Mutual Insurance Company was "picking up the tab." Precisely the same sort of interrogation occurred in *Swift* v. *Winkler, supra,* and there a plaintiff's judgment was reversed. In our opinion the nature of this action—the fact that a husband was suing the estate of his deceased wife for the wrongful death of their children—made it seem important to plaintiff to inform the jurors the estate would not really suffer damage.

danger of driving when tired and signed a pledge to follow the rules of good driving which included a promise not to drive when tired.

As had been planned previous to plaintiff's departure for Thailand, Mrs. Traxler and her children drove to Santa Ana on August 15 or 16 in the family car for a vacation. They stayed at the home of Gloria Toscano, Mrs. Traxler's sister. Mrs. Toscano was able to find temporary employment for Dwight with her employer, and she testified that Dwight drove them to and from work every day in her car. She felt that Dwight was a capable driver, but she occasionally had to remind him to slow down. A friend of Mrs. Toscano, Wynona Smith, testified that she saw Dwight driving the Traxler family car while alone "quite a few times," and that he "was just always there to jump in the car if someone wanted something from the store." Miss Smith heard Dwight's mother tell him he could not take the car and go "cruising" because there was too much traffic. Doris, Dwight's mother, told Miss Smith that she thought it was good experience for Dwight to drive, but not when traffic was heavy. She also told Miss Smith that Dwight had driven from their Sacramento home to Santa Ana and that she had not been at all worried.

On September 2, 1964, the day before the Traxler family was due to leave Santa Ana for home, Gilbert Gallegos, 33, a brother of Mrs. Toscano and Mrs. Traxler, came to the Toscano residence. He, a licensed California driver, was going to go back to North Highlands with Mrs. Traxler. The Toscano family, together with the Traxlers and Mr. Gallegos, went to a drive-in movie 5 miles from the Toscano home that night. They returned home at 1 a.m. and slept until approximately 8 o'clock the morning of September 3, 1964.

The departure day was spent very informally by all: Gallegos lazed around the front yard, dozing occasionally; Dwight was around the house and may or may not have napped; Mrs. Traxler and her sister did some last minute visiting, socializing and shopping. After dinner everybody watched television and Dwight fell asleep on the couch. He was awakened by his mother no more than an hour or so later to help her load the car for their return trip.

At about midnight the Traxlers and Gallegos drove away from the Toscano home. Gallegos was driving, Dwight was sitting next to him, Mrs. Traxler was in the back seat, and the six other children were either in the back seat or lying down in the aft compartment of the station wagon. No alcoholic beverages had been consumed by the parties at or after dinner.

The record is devoid of evidence as to what happened during the trip from the departure until the fatal accident. Actually, no witness testified about the

accident itself. Over objection that it had not been shown the witness was unavailable, plaintiff's attorney was permitted to introduce in evidence the former testimony of a California Highway Patrol officer.[2] The wrecked automobile, according to the officer, had been discovered at 7:18 a.m. the following morning (September 4). The officer testified the roadway on which the Traxlers had been traveling is elevated 40 feet above street level and is straight at the point the accident occurred. However, there is a curve to the right just south of the scene and one to the left just beyond. A 6-foot paved shoulder is adjacent to the extreme right 12-foot-wide traffic lane. At the outside edge of the shoulder there is a 6-to 8-inch high asphalt berm. Tire marks were found which ran along the berm for 55 feet, then mounted and straddled it and then crossed over it continuing on the dirt surface along the shoulder, which fell off at an angle of less than 45 degrees for another 224 feet. The vehicle apparently became airborne at this point and traveled a horizontal distance of 60 feet to the point of impact below. A large indentation in the soil marked that point.

The tire markings were not skid marks, but rather tire tracks which gave no indication of any braking or corrective steering action. The tracks showed no side slippage, but indicated that the vehicle had maintained a position somewhat parallel to the roadway and following the natural arc of the surface. This lack of side slippage would support an inference that the vehicle was not decelerating significantly but was probably maintaining its speed. This inference is reinforced by the horizontal distance traveled by the vehicle after leaving the ground. The investigating officer coded his report to show that the car left the roadway at a speed between 61 and 70

---

[2]A trial of the action had started on July 17, 1967. The highway patrol officer had been the first witness called by plaintiff at that trial. He had been examined and cross-examined. He was then excused. A juror was taken ill. A mistrial was declared. The highway patrol officer was not recalled at the second trial. There was no real showing that he was unavailable. Counsel for plaintiff, after defendant's counsel had made the objection, stated he was "unaware of where . . . [the officer] is presently." The court on that showing permitted the officer's former testimony to be read. This record shows the officer was not unavailable. His affidavit on hearing of the motion for a new trial establishes he was on duty and available to testify at all times. The court at the trial had made the statement: "The officer was excused." "The officer is not now available." The assumption was incorrect. The officer's affidavit besides asserting his availability states: ". . . I was at no time requested to return to the Sacramento area for the purpose of testifying . . . , nor was I contacted by any person with regard to giving additional testimony." It is the burden of the party seeking to offer former testimony to prove the unavailability of the declarant as a witness. (Evid. Code, § 1291; *Blache* v. *Blache* (1951) 37 Cal.2d 531, 535 [233 P.2d 547].) Admission of the former testimony was improper. The officer's former testimony had been uncertain and in some respects contradictory with respect to the possible range of speeds, expressed in miles per hour, that the vehicle had been traveling when it had left the highway. The court edited out some of this uncertainty. Also defendant's attorney was deprived of a possible source of impeachment which might have had considerable weight.

miles per hour, but stated that it was impossible for him to estimate the speed of the vehicle. (But see fn. 2.)

The time of the accident was estimated to have been 5:28 a.m., based on the time at which a lady's wrist watch found in the wreckage had stopped. It was dark at that time. The officer testified that when he arrived on the accident scene the weather was clear and the roadway dry.

Dwight's body was in the driver's seat behind the wheel, so badly pinned that mechanical means were required to extricate it. Gilbert Gallegos was found in the front passenger seat, Mrs. Doris Traxler in the back seat. Blood samples drawn from Dwight and from the two-year-old girl showed no trace of alcohol or of carbon monoxide. Several windows of the car had been open at the time of the crash. The right front tire was going flat at 7:18. This was related by the officer to the impact. The car was apparently in good condition but for impact damage.

James Collins, a mechanical engineer and crash reconstruction expert, examined the Traxler car and testified that it was in good working order at the time of the crash. There was no indication of impact with any other car. Collins found that the lights had been on low beam at the time of the accident.

This court would properly reverse the judgment appealed from on either of the two grounds discussed in the margin (in fns. 1 and 2), to wit: plaintiff's abuse of the limited scope of permitted examination of jurors regarding their interest in casualty insurers, and the improper admission into evidence of the highway patrolman's former testimony. The principal grounds urged for reversal, however, are insufficiency of the evidence to support a verdict on either cause of action. Before applying ourselves to the discussion of each ground separately, we will mention a few principles of hornbook law which guide this court in such discussion. ■ "[W]hen a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ■ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the . . . [trier of the fact]." (*Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) The meaning of *"substantial evidence"* was explored in *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]. There it was said to be evidence which "has probative force," that which is " 'such relevant evidence as a reasonable man might accept as adequate to support a conclusion' " (quoting *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197 [83 L.Ed. 126, 59 S.Ct. 206]); " 'such as will convince reasonable men who will not reasonably

differ as to whether evidence establishes plaintiff's case.'" The court in *Teed* concludes on this subject: "The sum total of the above definitions is that, if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance." Inferences, and cases defining inferences, are discussed at length in Witkin, Cal. Evidence (2d ed. 1966) pp. 1050-1054, summed up with a quotation from *Savarese* v. *State Farm etc. Ins. Co.* (1957) 150 Cal.App.2d 518, 520 [310 P.2d 142]: "'Of course, the building of inference upon inference may often result in a progressive weakening of logical sequence, and lead to an ultimate conclusion which is untenable on the basis of the facts proven. When an ultimate inference is thus remote from the evidence, it should be rejected.'" Professor Thayer has been quoted in *Moody* v. *Peirano* (1906) 4 Cal.App. 411, 418 [88 P. 380] (and again in Witkin, Cal. Evidence (2d ed. 1966) 275): "'No precise or universal test of relevancy is furnished by the law. The question must be determined in each case according to the teachings of reason and judicial experience.'" Witkin (*id.* at p. 275) also quotes from Uniform Rule 1 (2) Comment. ■ We will paraphrase the quotation as adding up to the statement that the only test of relevancy is logic and common sense. Since "relevancy" is the first rule of the admissibility of evidence, this court now examines the evidence as to each count to determine if relevant, substantial evidence supports either verdict.

### Re Substantial Evidence of Negligent Entrustment

■ Direct evidence establishes that Gallegos was driving when the travelers left southern California, that Dwight was then riding in the front seat and that his mother was then riding in the back seat. Physical evidence proves that Dwight was the driver when the accident occurred, that Gallegos was occupying the seat formerly occupied by Dwight, and that Doris was still riding in the back seat. An inference may be drawn from the reconstruction of the course of the automobile immediately before and during its fatal plunge that Dwight went to sleep while driving and that this was the cause of the accident. The limits of permissible inference are reached (and perhaps exceeded) if we assume that when the change of drivers took place Doris knew of the change and consented to it.

To reach even that point the jury had to assume that Doris was awake, or had been awakened, when Dwight became the driver. When, during the long journey from Santa Ana to Merced, the change of drivers occurred and what the circumstances and conditions under which it was accomplished were are matters which remain unknown. Dwight's assumption of the driving may have been five minutes before the accident. It may have happened some time following the boy's refreshment by several hours sleep. Equally tenable is a conjecture that the switch in drivers was made shortly after the beginning

of the trip. We mention this disparity of possibilities to point up the absurdity of attempting to reach *any logical conclusion*. We have nothing but gross speculation. Nor is there any presumption which the law permits the jury, or this court, to make.

We see no significance in any of the following facts: that Dwight's learner's permit was not found on his person, that the car may have been traveling between 60 and 70 miles per hour, that Dwight's stepfather had not agreed that it was proper for him to drive at night or upon freeways. There was no proof the learner's permit was not elsewhere in the car (e.g., in Doris' possession), nor did its location matter since absence of the learner's permit was not a proximate cause of the accident. Assuming the speed of the car to have been within the range stated, that estimate does not create a circumstance sufficient to permit the inference that it was either known with sufficient exactitude or, if known, sufficiently excessive to require deceleration on this uncongested highway on a dry summer night. ■ The fact that Wayne and Doris did not see eye-to-eye as to when and under what circumstances Doris' son should drive is not proof of Doris' negligence. The evidence we have related above indicates that Dwight was a normal 16-year-old boy as well skilled and experienced as a driver as any other person of his age. To hold that it was negligence to entrust the driving of this automobile to him would be equivalent to a holding that it is negligent to permit any 16-year-old on a freeway at night. The record does not allow that broad an inference.

### Re Substantial Evidence of Wilful Misconduct

It was both pleaded and stipulated that the liability of Dwight's estate depended upon plaintiff's proof of his wilful misconduct. That was the theory upon which the case was tried and the jury instructed. "Wilful misconduct" under the "Guest Statute" (Veh. Code, § 17158) is intentionally doing or failing to do something in the operation of a motor vehicle which should or should not be done, with express or implied knowledge that an injury to a guest will be a probable result. It necessarily involves deliberate, intentional or wanton conduct. It is to be distinguished from gross negligence, although the line may be one not always easy to draw.[3] Gross negligence indicates a passive or indifferent attitude toward results. Wilful misconduct is something more than that. It involves a more positive attitude; an absolute disregard of consequences. Cases defining wilful misconduct

[3]The necessity of distinguishing may be stressed because as originally adopted (Stats. 1929, ch. 787, p. 1580) the guest law included gross negligence as a basis of liability. That was removed in 1931 (Stats. 1931, ch. 812, p. 1693). Ever since wilful misconduct and intoxication have been the only grounds of liability to a guest in a motor vehicle.

and distinguishing it from gross negligence are many. (See *Fiske* v. *Wilkie* (1945) 67 Cal.App.2d 440, 450-452 [154 P.2d 725]; West's Ann. Cal. Codes, Veh. Code, § 17158, notes 72-75; 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 361, pp. 1562-1563.) In *Fiske* v. *Wilkie, supra,* at pages 451-452, the court stated: "Experience has taught that certain kinds of automobile accidents rarely happen without negligence on the part of the driver; that in many, if not most, of such accidents, the driver alone knows just what happened; and, for that reason, if the driver cannot or will not explain the cause of the accident, those injured in the accident, in order to enforce their remedy, are entitled to the presumption of the driver's negligence arising under the doctrine of res ipsa loquitur upon proof that the accident occurred while the automobile was under the exclusive control of defendant. On the other hand, experience teaches that most accidents of the kind in the instant case are not the result of the driver's intention to harm guests or even the result of the driver's disregard for the probable or possible consequences of any act, but that they are usually the result of negligence or inadvertence."

Cases may be decided more readily by reference to their facts than by recourse to the somewhat abstract and abstruse rules of law we have recited above. *Fiske* v. *Wilkie, supra,* 67 Cal.App.2d 440, had facts similar to the facts in the case before this court. There evidence showed that defendant's vehicle veered off a well paved, straight and level roadway at night and crashed into a tree. No explanation of the accident was available other than the inferences which could be drawn from the physical facts and circumstances of the crash. The weather at the time had been clear and dry, the road surface free from defects, and defendant's car in good operating condition with functioning headlights which were on at the time of the crash. The court on appeal rejected plaintiffs' claim that the facts submitted showed wilful misconduct.

In *Strnod* v. *Abadie* (1960) 181 Cal.App.2d 737 [5 Cal.Rptr. 627], the court in holding there was no proof of wilful misconduct, pointed to the fact that there had been no showing whatever the driver had previously been sleepy or was aware of the approach of a soporific condition. The court says (on p. 740): "He might have fallen asleep without realizing his drowsiness. . . . There is no evidence from which any one particular inference could be drawn.

█ " 'A legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established. (Citation.) It is axiomatic that "an inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture or guesswork." ' "

(*Eramdjian* v. *Interstate Bakery Corp.*, 153 Cal.App.2d 590, 602 [315 P.2d 19].)"

The cases relied upon by plaintiff are distinguishable. In fact, a statement of their facts in juxtaposition with the facts of *Fiske* and with the facts of the case before us furnish an illustration of the rule stated above. *Morrison* v. *Townley* (1969) 269 Cal.App.2d 863 [75 Cal.Rptr. 274], is a case where defendant driver had been awake for from 21 to 22 hours without rest, had completed a full work day and had done considerable hazardous driving before attending a drive-in movie from which she was returning at the time of the accident. In *Williams* v. *Carr* (1968) 68 Cal.2d 579 [68 Cal.Rptr. 305, 440 P.2d 505], the driving defendant had been awake continuously for as much as 20 hours, had had a number of drinks of beer, was aware that he was sleepy. It was held he was properly found guilty of wilful misconduct. In *Pennix* v. *Winton* (1943) 61 Cal.App.2d 761, 764 [143 P.2d 940, 145 P.2d 561], there was proof the driver had been drinking, had " 'doze[d] off once and . . . kind of shook it off,' " realizing that his eyes had closed at intervals. The same, or a similar, distinguishing factor is present in *Halstead* v. *Paul* (1954) 129 Cal.App.2d 339, 340-341 [277 P.2d 42].

■ We conclude that there is no substantial evidence to support the verdict that Dwight was guilty of wilful misconduct.

### *The Future of This Litigation*

The judgment must be reversed. Plaintiff argues it should be remanded for retrial. He bases this argument on *Whitehill* v. *Strickland* (1967) 256 Cal.App.2d 837 [64 Cal.Rptr. 584 ], hear. den. We do not find the *Whitehill* case apposite. It involved an automobile accident in which a mother, Mrs. Whitehill, and her minor daughter, Susan, were killed. The driver of the car, Strickland, was the stepfather of Mrs. Whitehill's husband. Mr. Whitehill and his son, Michael, sued Strickland for the wrongful deaths of Mrs. Whitehill and Susan. Whitehill was sole owner of the car being driven by Strickland. Strickland was en route from San Francisco to Riverside to visit a son; Mrs. Whitehill's destination was Sherman Oaks. It was suggested by Mrs. Whitehill that Strickland ride with them in the Whitehill automobile to help with the driving. The accident happened in Santa Clara County on the trip south. The appellate court reversed a nonsuit based on plaintiffs' failure to show either wilful misconduct or intoxication under the guest statute, holding on appeal that the statute barred an owner injured while his own vehicle was being driven by another from recovering from the driver unless intoxication or wilful misconduct was established. Because Fred Whitehill owned the car as his separate property, the guest statute did

not apply to his wife as an *owner*. Strickland did not achieve the status of a host since he did not own, borrow or rent the car, nor did he have charge of it. Mrs. Whitehill was a host rather than a guest. Neither she nor her daughter, Susan, were guests of Strickland, the driver. Accordingly, the guest statute did not apply. ▇ It applies only to a person riding in a vehicle as owner, being driven by another person with an owner's permission or to guests.[4] ▇ *Whitehill* has no applicability to the case before this court. Doris Traxler was a coowner of the automobile. Here plaintiff does not sue on behalf of Doris; effectually he sues Doris. If we were to accept plaintiff's postulation that *Whitehill* applies to the facts of this case, we would be rewriting the guest statute. This court would be holding that any time any person other than an owner is driving with the consent of an owner and in an owner's presence the guest statute is inapplicable to other riders who, if an owner were driving, would be treated as guests. Moreover, plaintiff here sues under the theory that Doris (and Dwight because of the claimed entrustment) occupied the status of host and that the children were guests under the provisions of the guest statute. (See fn. 4.) The parties so stipulated. Plaintiff's counsel said: "[W]e are prepared to stipulate that the deceased children, of this lawsuit, were guests—host to guests as opposed to passengers. The status of occupants of the vehicle is not of issue. They were guests, therefore the duty was that of host to guests." This proposed stipulation was accepted by defense counsel. Plaintiff having breathed hot would now breathe cold. The complaint was filed in 1965. It was tried in 1967. Litigation should come to an end some time. With courts clogged and costs of law suits to parties and the public ever rising, a litigant who has had his "day in court" under a selected theory of the law applicable to the facts should not have the right to try, try again.

We do not reach the other contentions submitted by defendant.[5]

---

[4]Vehicle Code section 17158 provides: "No person riding in or occupying a vehicle owned by him and driven by another person with his permission and no person who as a guest accepts a ride in any vehicle upon a highway without giving compensation for such ride, nor any other person, has any right of action for civil damages against the driver of the vehicle or against any other person legally liable for the conduct of the driver on account of personal injury to or the death of the owner or guest during the ride, unless the plaintiff in any such action establishes that the injury or death proximately resulted from the intoxication or willful misconduct of the driver."

[5]These other contentions are:

(1) That any negligence or wilful misconduct of the defendants is imputed to plaintiff, as coowner of the vehicle and signer of Dwight's license application, under Vehicle Code sections 17150 and 17707-17708, thus barring him from recovery at least to the extent of the statutory limit on his own liability;

(2) That the common law rule preventing a child from suing his parent for a negligent tort (see *Klein* v. *Klein,* 58 Cal.2d 692, 696 [26 Cal.Rptr. 102, 376 P.2d 70]) also bars this suit for damages for the wrongful death of the children;

Judgment is reversed and the cause is remanded with directions that judgment be entered in favor of defendant.

Friedman, J., and Janes, J., concurred.

A petition for a rehearing was denied March 9, 1970, and respondent's petition for a hearing by the Supreme Court was denied April 9, 1970.

---

(3) That the giving of certain specified instructions constituted reversible error, to wit:

(a) The instructions concerning Vehicle Code section 12509 were incorrect in that they allowed a determination of liability on the irrelevant basis of whether Dwight had his learner's permit in his immediate possession and whether Gilbert Gallegos had his driver's license with him at the time of the accident.

(b) It was error to instruct the jury that it could infer that Dwight conducted himself with knowledge that serious injury to a guest would probably result from his conduct. There was no evidence to support the giving of such an instruction.

(c) It was error to give instructions which spoke in terms of negligence of the driver. His negligence was not in issue. Plaintiff's children were admittedly guests and wilful misconduct was the sole issue with respect to the conduct of the driver.