[No. H000950. Sixth Dist. Mar. 5, 1987.]

LOUIS & DIEDERICH, INC., Plaintiff and Respondent, v.
CAMBRIDGE EUROPEAN IMPORTS, INC., Defendant and
Respondent;
LARRY MILLER et al., Third Party Claimants and Appellants.

**1578**

Counsel

Mount & Kraw, James E. Lewis, Jr., George M. Kraw, E. Paul Atkins, Donohue, McElroy & Atkins, Samuel D. O'Brien and Mercant & O'Brien for Third Party Claimants and Appellants.

Gerald Z. Marer, John F. Schuck, John H. Coward, Dunbar, Coward & Moore and Dunbar, Maddigan, Coward & Moore for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

Opinion

**BRAUER, J.**—As a provisional remedy in the course of his lawsuit against a car dealer (Cambridge European Imports, Inc.) for nondelivery of a new Ferrari which had been paid for in full, plaintiff Louis & Diederich, Inc. (Louis) obtained an order giving him the right to attach a Mercedes-Benz on the dealer's showroom floor. This order provided that the dealer continue to offer the Mercedes for sale to the public and pay Louis the proceeds from any sale. In compliance with the order, the dealer turned over to Louis the pink slip on the Mercedes. Unbeknownst to Louis, however, the dealer had already applied for a duplicate pink slip from the Department of Motor Vehicles (DMV) in the process of selling the Mercedes to another. The car changed hands several times before Louis was able to run it to earth in the possession of one Larry Miller. The appeal before us now is taken from an order directing Miller to deliver the Mercedes to Louis. We are asked to assess the competing interests of Louis and Miller and to determine whether substantial evidence supports the order of the court. We find that Miller was a bona fide purchaser, who gave value for the Mercedes with no knowledge of Louis's claim. As such, his interest is superior to that of Louis; he is therefore rightfully in possession. Accordingly we will reverse the court's order.

The Facts

*The Mercedes*

Before launching into our factual discussion, we are obliged to take a moment to comment upon one aspect of this case where utter confusion reigns. The vehicle identified on the pink slip held by Louis, and on the DMV documents evidencing the subsequent transfers, is a 1984 MBZ 500 SEC, ID# WDB 1260441A040136. Yet there is not one single court order in the record, of the many that were issued, which refers to the Mercedes by that year, model and ID number.

Louis maintains resolutely that the car was a 1983 rather than a 1984 Mercedes SEC. Indeed there is some evidence to support this assertion, in the form of two certified DMV documents, both filed before Louis entered the picture. The first is a certificate showing pollution control work done on a 1983 MBZ with the above ID number, on February 28, 1984. The second is a "Verification of Vehicle," prepared by the dealer and dated February 29, 1984, verifying that a 1983 MBZ SEC bore the ID number listed above on a metal plate visible through the windshield.

A representative of Louis submitted a declaration in which he states that he saw a Mercedes 500 SEL[1] on the dealer's showroom floor. Upon inspecting this car he found that the ID number on the pink slip in his possession corresponded to the number on the car door, but that the plate visible through the windshield bore an entirely different ID number. On the other hand, an interim owner of the car thought that the ID number on his pink slip had matched the one easily visible through the car's windshield.

Several of the court's various orders in these proceedings refer to an SEL model Mercedes. Of these, one recites an ID number different again from both ID numbers viewed by Louis's representative, one includes the right number but specifically refers to the vehicle as a sedan rather than a coupe, one transposes several digits in the ID number, and one omits a digit. The orders which identify the vehicle correctly as an SEC model consistently list the ID number with one digit missing. Some refer to a 1983 Mercedes and others to a 1984.

While we cannot ignore these discrepancies, we do not feel it necessary to dwell upon their possible meaning or effect. For our purposes all we need know is this: Both Louis and Miller lay claim to the vehicle in Miller's possession. Each bases his claim upon a DMV certificate of ownership describing a 1984 MBZ 500 SEC, ID# WDB 1260441A040136. Whether the car is actually a 1983 model or whether it bears a second ID number in addition to the one on the pink slip need not concern us. Furthermore, questions regarding the validity of the succession of orders improperly identifying the car are moot, since we reverse the order before us now. For the sake of clarity we will proceed on the assumption that there is only one Mercedes, that it is a 1984 SEC, and that it found its way into Miller's possession in the following manner.

*Louis's Interest*

The Mercedes's journey began on January 26, 1984, when it was shipped

---

[1] The SEL model is a four-door sedan; the SEC is a two-door coupe.

from Germany to the American dealer, Cambridge European Imports, Inc. (Cambridge). It was purchased on February 18, 1984, by Syufy Enterprises (Syufy) for $41,000. The DMV issued its certificate of ownership to Syufy on April 10, 1984. On August 16, 1984, Syufy countersigned the pink slip, and apparently returned it and the car to Cambridge on or around that date.[2]

Meanwhile, Louis had entered into a contract with Cambridge on May 21, 1984, to purchase a 1984 Ferrari 308 GTSi for the price of $55,956.00. Louis paid the full purchase price but the vehicle was never delivered. On September 20, 1984, Louis filed a complaint against Cambridge, and against its President Craig Wood (Wood), for breach of contract, negligent misrepresentation, and intentional misrepresentation. On September 26, 1984, the first of a series of orders issued, namely an ex parte right to attach order and order for issuance of a writ of attachment. This order gave Louis the right to attach property of Cambridge totalling $55,956, and in particular named the Mercedes as the subject of the ordered writ of attachment. The order noted that the Mercedes was to remain on the showroom floor.

After a hearing on October 24, 1984, a further order issued, on November 2, 1984, adding a Porsche to the writ of attachment,[3] providing that proceeds from the sale of either of these cars be paid to Louis, and directing that Cambridge turn over to Louis documentation of his title to the Mercedes. Shortly after this November 2 order, Cambridge delivered to Louis the pink slip which had been endorsed by Syufy.

There followed an abortive attempt by Louis to perfect his security interest in the Mercedes. On November 14, 1984, Louis sent the orders filed September 26 and November 2 to the Santa Clara County Sheriff, requesting that the sheriff file a notice of the attachment with the DMV. The sheriff duly forwarded its "Attachment Lien Notice" to the DMV, however omitting a letter in the vehicle ID number. The notice was returned on November 27, 1984, with a notation that there was no record of such a vehicle.

On December 26, 1984, the parties, through their counsel, entered into a stipulation. Cambridge and Wood promised to use their best efforts to sell the Mercedes, while at the same time ordering for Louis a 1985 Ferrari with the same accessories contained in the original contract for the 1984 Ferrari. If the Mercedes sold, the funds were to be held in trust and applied to the purchase of the Ferrari. If the Ferrari was not delivered by February 1, 1985, Louis would be entitled to judgment against Cambridge on his complaint.

---

[2]Louis maintains in his brief that Syufy returned the car upon discovering that it was a 1983 rather than a 1984 model. Syufy is not a party to this lawsuit, however, and there is no evidence in the record to support this assertion.

[3]The Porsche is the subject of another lawsuit.

The Ferrari did not arrive, and judgment was entered against Cambridge on February 5, 1985. On February 8, 1985, an order was filed directing that Cambridge and Wood transfer the Mercedes to the sheriff pursuant to a Writ of Execution issued the same day as the judgment.[4] At this point, however, the Mercedes had long since been transferred to another, namely Gene Cochran, whose story we take up next.

*The Sale to Cochran*

In June of 1984, in response to an ad placed by Cambridge in the Wall Street Journal, Gene Cochran visited the Cambridge showroom. Eventually he decided to purchase, sight unseen, a new 1984 Mercedes SEC, to be delivered from Germany. On June 6, 1984, he gave Cambridge his check for $35,821, representing the European price of the car, with the understanding that additional fees would be charged for shipping, conversion, and dealer profit. The car was to be delivered within 90 days.

By October, the car had not yet arrived. In October and November, Cochran performed some accounting services for Cambridge at Cambridge's place of business. One day during this time he saw Wood's wife, Paula Wood, driving a Mercedes SEC of the same color he had ordered. He was told by Wood that this was his car. He was shown a pink slip, but could not remember the name on it. The Woods assured him that they would do "the DMV work" and he executed a power of attorney to Paula Wood for this purpose. Paula Wood also possessed a similar power of attorney from Syufy. It was agreed that the balance of the purchase price, approximately $8,000, would be in the form of a credit for accounting services rendered by Cochran. Cochran took possession of the Mercedes some time in November of 1984.

This transaction is reflected in the following documents filed with the DMV: 1) an "Application for a Duplicate Ownership Certificate," signed by Paula Wood for Syufy; 2) a "Release of Ownership" on the reverse side of this application, dated November 1, 1984, showing Syufy as the releasing owner, Cochran as the new owner and Cambridge as the dealer. Both Syufy's and Cochran's signatures are by Paula Wood. The purchase price is listed as $45,000; 3) an "Ownership/Registration" form in the name of Gene Cochran bearing an issuance date of November 1, 1984; 4) a "Bill of Sale," dated November 1, 1984, indicating no price and signed by Cambridge as seller; 5) a "Report of Sale" dated November 1, 1984, signed by Cochran himself as purchaser.

---

[4]The writ of execution in the record, while referring to the judgment entered on February 5, 1985, bears an issuance date of April 30, 1985.

A registration card was issued by the DMV on February 28, 1985, showing Cochran as the registered owner. By then Cochran had already been in touch with John Perrins, an automobile broker located in Sacramento. According to Cochran, Perrins had contacted him "approximately mid-January." Perrins had "some dealings with Cambridge" and had a buyer interested in purchasing a 500 SEC. This sale did not materialize, however, because the parties could not agree on price.

Some time in mid-March of 1985, Cochran received "a DMV type of thing that something was going on." In response to this, he called Louis's attorney, who informed him that the Mercedes was, in Cochran's words, "in security" for Louis. Around this time Perrins produced another prospective buyer, Larry Miller, who looked at the car at Cochran's house and agreed to pay $42,000 for it. Shortly thereafter, two officers from the sheriff's department appeared at Cochran's house and announced that they were there to seize the car. Cochran told them he was the legal owner and asked them to verify ownership with the DMV. They did so, found that title was in Cochran's name, apologized to him and left. A "Non Service Return," issued by the sheriff and dated March 25, 1985, indicates that the sheriff was unable to effect service of an execution levy on defendant Cambridge European Imports at Cochran's address, for the reason that "Vehicle Not Registered to Deft."

The deal with Miller was then consummated and the Mercedes changed hands once again.

*The Sale to Miller*

Larry Miller declared, under penalty of perjury, that on or about the last week in March he saw an ad in the San Jose Mercury for a 1984 MBZ 500 SEC, with a Sacramento phone number for John Perrins. He called Perrins who told him the car was on consignment from Cochran and directed him to Cochran's house. Miller went to Cochran's house, inspected the vehicle and verified that Cochran had the registration card and pink slip. On April 1, 1985, Miller purchased the car from Perrins. The Perrins/Miller contract was then purchased by Morris Plan.

The following documents evidence this transaction: 1) a security agreement of Morris Plan dated April 1, 1985, showing Miller as buyer and Perrins as dealer/seller of a 1984 MBZ 500 SEC, for a sales price of $42,000, including a downpayment of $8,000 in the form of a trade-in by Miller of a 1978 MBZ 280 CE; 2) a DMV "Notice of Sale" showing Miller as the buyer and Perrins as the seller of a 1984 MBZ 500 SEC; 3) a DMV "Notice of Sale" showing Perrins as buyer and Miller as seller of a 1978 MBZ 280 CE; 4) a

printout of a DMV vehicle registration record showing Larry Miller as the buyer of the Mercedes, with a transfer date of April 1, 1985.

On May 22, 1985, Louis obtained a supplemental order which directed Cambridge, Wood and now Cochran to deliver the Mercedes to the sheriff.[5] Louis then learned that the car had been sold to Miller and sought an additional order adding Miller to the order directing transfer. Instead, on May 28, 1985, the court issued a temporary restraining order enjoining Wood, Cambridge, Cochran and Miller from selling the car or removing it from the state, and an order directing Cochran and Miller to appear and show cause why they should not be ordered to transfer the Mercedes to the sheriff.

Cochran was deposed under an order of examination procedure held June 12, 1985. Hearing on the TRO/OSC was held on July 11, 1985, whereupon the court found that "Plaintiff is entitled to possession of the property." On July 12, 1985, a written order was filed directing that Miller deliver the Mercedes to Louis. This order was modified on July 16, 1985, to add that the sheriff seize the vehicle should Miller fail to deliver it voluntarily. Cochran, Miller, and Morris Plan filed appeals from the transfer order.[6] Execution of the order was stayed pending determination of these appeals.

## ISSUES

The argument made by all appellants is this: Louis did not perfect his security interest in the Mercedes so as to give notice to the world of his claim. Subsequent purchasers and encumbrancers without actual notice are entitled to rely upon the state of the title as represented by the title documents. Therefore Miller, who had no knowledge of Louis's interest, took clear title to the Mercedes.[7]

Louis does not contend that he perfected his security interest. He argues instead that the order must be affirmed because there was substantial evidence in the record to support an implied finding that both Cochran and Miller knew of the defect in title brought about by Louis's claim and were thus not bona fide purchasers.

Since our focus will be upon whether the order was supported by substantial evidence, we first set forth the appropriate standard of review.

---

[5]This order is not contained in the record.

[6]Morris Plan was granted standing to do so by stipulation of all parties.

[7]Since we decide the appeal on the basis of this argument, we do not find it necessary to address certain ancillary issues raised by appellants, namely: whether Cambridge and Wood were agents of Louis or of Cochran, whether the court exceeded its authority under Code of Civil Procedure section 708.205 when it directed Miller to deliver the Mercedes, or whether Perrins was an intervening owner.

*Standard of Review*

■ Our task when reviewing the sufficiency of the evidence "begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact]." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We "have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

■ Louis correctly points out that he is entitled to the benefit of all reasonable inferences which can be drawn from the evidence before the trial court. ■ Further, these inferences may be based on circumstantial evidence: "[¶] The inferences to be drawn from circumstantial evidence are for the [trial court's] determination and if conflicting inferences may reasonably be drawn from the evidence which inference is to be drawn lies in the [trial court's] discretion. [Citations.] It is equally true that a reasonable inference drawn from circumstantial evidence may be believed as against direct evidence to the contrary." (*Halstead* v. *Paul* (1954) 129 Cal.App.2d 339, 341 [277 P.2d 43].)

■ Since circumstantial evidence is itself the result of an inferential process (*People* v. *Goldstein* (1956) 139 Cal.App.2d 146, 152 [293 P.2d 495]), it follows that a judgment or order may be supported by substantial evidence based upon inferences drawn from inferences, even though there is opposing direct testimony. (*Vaccarezza* v. *Sanguinetti* (1945) 71 Cal.App.2d 687, 698 [163 P.2d 470].)

While this is true as an abstract proposition, in practice the cases have held that such evidence can support a judgment only "where the first inference is properly drawn from sufficient evidence, and the second inference is not too remote." (Witkin, Cal. Evidence (2d ed. 1966) § 1134, p. 1052.) Otherwise, "the building of inference upon inference may often result in a progressive weakening of logical sequence, and lead to an ultimate conclusion which is untenable on the basis of the facts proven." (*Savarese* v. *State Farm etc. Ins. Co* (1957) 150 Cal.App.2d 518, 520 [310 P.2d 142].)

■ An inference must be the product of logic and reason. (Evid. Code, § 600, subd. (b).)[8] It must rest on the evidence, on probability rather than

---

[8]Evidence Code section 600: "(b) An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."

on speculative possibility or conjecture. (*Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657].) And it must comport with physical laws and human experience. (*Traxler* v. *Thompson* (1970) 4 Cal.App.3d 278 [84 Cal.Rptr. 211].)

■ Louis makes much of what he characterizes as a deficient record on appeal, consisting only of "a partial clerk's transcript" which allegedly omits "much evidence which was before the trial court and which could have further supported the trial court's orders." He mentions "numerous declarations and affidavits presented to the trial court on Louis' behalf." He fails, however, to inform us which evidence in particular we are lacking and how this evidence might have supported the order. We find the following documents referred to, but not contained in, the record: the complaint of Louis v. Cambridge; the Writ of Execution issued February 8, 1985; and the Supplemental Order of May 22, 1985, adding Cochran to the order directing transfer of the Mercedes. Obviously these documents are not evidentiary in nature. Nor are they, in our view, in any way helpful to support the challenged order. The one piece of evidence we do find lacking is the pink slip issued to Cochran by the DMV. In the process of transferring the vehicle to Miller, the pink slip presumably would have been sent to the DMV in exchange for a new certificate issued to the transferee; therefore, its absence is not surprising. Moreover, Cochran's registration card, which contains the same ownership information, is part of the record.

We agree that it is the responsibility of the appellants to provide a record on appeal that clearly demonstrates error. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564 [224 Cal.Rptr. 664, 715 P.2d 624].) In the absence of information identifying evidence missing in the record, however, we cannot simply presume, as Louis asks us to do, "that the trial court was provided with a sufficient showing to validate its . . . order." (*County of Los Angeles* v. *Surety Ins. Co.* (1984) 152 Cal.App.3d 16, 23 [199 Cal.Rptr. 351].) We therefore proceed with our analysis on the basis of the record before us.

*The Status of the Parties*

The parties generally agree that Louis's status is that of a creditor with an unperfected security interest in the Mercedes.[9] Since Louis's collateral remained part of the dealer's inventory, the Commercial Code, rather than the Vehicle Code governs the manner of perfecting the security interest. (Cal. U. Com. Code, §§ 9302, subd. (3)(b), 9401; Veh. Code, § 5907.) (7) (See fn. 10.) Under either code, however, Miller will prevail if he purchased the

[9] We note that Cochran argues first that Louis did not acquire a security interest, and in the alternative that if he did, it was unperfected.

Mercedes for value without knowledge of Louis's security interest—in other words, if he was a bona fide purchaser.[10] (Cal. U. Com. Code, § 9301; *T & O Mobile Homes, Inc.* v. *United California Bank* (1985) 40 Cal.3d 441 [220 Cal.Rptr. 627, 709 P.2d 430]; *Ferraro* v. *Pacific Fin. Corp.* (1970) 8 Cal.App.3d 339 [87 Cal.Rptr. 226].)

 Division 9 of the Commercial Code "sets out a comprehensive scheme for the regulation of security interests in personal property." (Off. com. to Cal. U. Com. Code, § 9101.) The principal test to determine whether a transaction comes under Division 9 is this: was the transaction intended to have effect as security? (Off. com. 1, § 9102.) A security interest is created and becomes enforceable when 1) the debtor has signed a security agreement, 2) value has been given, and 3) the debtor has rights in the collateral. (Cal. U. Com. Code, § 9203.) All of these conditions prevailed when Louis and Cambridge signed the stipulation, on October 30, 1984, providing that a writ of attachment issue but that Cambridge retain possession of the Mercedes.

 We find no merit in Cochran's argument that Cambridge had no ownership interest in the Mercedes which it could pledge as security. Syufy released its interest completely by delivering the car and the endorsed and dated pink slip to Cambridge in August. (Veh. Code, §§ 5600, 5602; *Laureano* v. *Christensen* (1971) 18 Cal.App.3d 515 [95 Cal.Rptr. 872].) Cambridge was not required to make any DMV filing until it transferred ownership to another. (Veh. Code, § 5906.) In the interim Cambridge owned the car.

A security interest survives a sale of the collateral, unless the secured party consented to the sale. (Cal. U. Com. Code, § 9306.) To be effective against a purchaser, however, the security interest must have been "perfected" prior to the purchase. Perfection is accomplished by filing a financial statement with the Secretary of State, or by possession of the collateral, neither of which occurred here. (Cal. U. Com. Code, § 9302.)

An unperfected security interest is subordinate to the rights of "a person who is not a secured party and who is a . . . buyer not in the ordinary course of business to the extent that he gives value and receives delivery of the

---

[10]There was no evidence whatsoever that Morris Plan had any knowledge of Louis's security interest. Under the Commercial Code, the concept of good faith purchaser for value includes an encumbrancer who gives value with no knowledge of a prior interest. (Cal. U. Com. Code, § 1201, subds. (32) and (33).) Moreover, Morris Plan perfected its interest whereas Louis did not. (Cal. U. Com. Code, § 9312, subd. (5)(a).) Therefore Morris Plan's interest in the Mercedes would be superior to Louis's even if it were shown that Miller was not a bona fide purchaser. Our holding today, however, obviates the need to focus upon this issue.

collateral without knowledge of the security interest and before it is perfected." (Cal. U. Com. Code, § 9301, subd. (1)(c).)

A "buyer in ordinary course" is one who buys "from a person in the business of selling goods of that kind." (Cal. U. Com. Code, § 1201, subd. (9).) Miller did not buy from a dealer; he is therefore a buyer "*not* in the ordinary course of business" under section 9301.[11] He gave value and took possession of the car. The critical factor therefore is whether he had knowledge of Louis's security interest.

Under the Commercial Code, a person has "knowledge" of a fact when "he has *actual* knowledge of it." (Cal. U. Com. Code, § 1201, subd. (25)(a), italics added.) This definition is embodied in the concept of "good faith." Good faith is "honesty in fact in the conduct or transaction concerned." (Cal. U. Com. Code, § 1201, subd. (19).) The good faith of a buyer is therefore to be determined by what he actually knew, rather than what a reasonable man should have known from all the circumstances. (Cal. Commercial Law: I (Cont.Ed.Bar 1966) § 14.3, p. 626.) The actual knowledge test presumes of course that the registration and ownership documents do not reveal a defect in title. (See, e.g., *Morris Plan Co. v. Moody* (1968) 266 Cal.App.2d 28 [72 Cal.Rptr. 123], where it was held that plaintiff "should have known" of a title problem because the seller did not produce the pink slip.)[12]

In regard to registration of motor vehicles, California is a "full title" state. This means that a buyer who has no actual knowledge of a defect in title is entitled to rely upon the information reflected on the registration and ownership certificates, without further inquiry. (*T & O Mobile Homes, Inc. v. United California Bank, supra,* 40 Cal.3d 441.) In *T & O,* the Morgans purchased a mobilehome for approximately $17,000, obtained financing through Bank, and gave Bank a security interest in the mobilehome. Bank mailed the properly endorsed certificate of title to the DMV, requesting issuance of a new certificate showing it as legal owner. By mistake, a certificate

---

[11]On the other hand, Cochran, who bought from Cambridge, may have been a buyer in ordinary course to the extent that he gave new value. As such he would be entitled to the additional protection of section 9307, taking the Mercedes "free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence," as long as he did not know that the sale was "in violation of the ownership rights or security interest of a third party." (Cal. U. Com. Code, § 1201, subd. (9).)

[12]Cases cited by Louis for the proposition that an objective test should apply here are inapposite. In *Sierra Financial Corp. v. Brookes-Farrar Co.* (1971) 15 Cal.App.3d 698 [93 Cal.Rptr. 422], the buyers actually knew of the security interest; the question was whether they were nonetheless buyers "in ordinary course." *People v. Brumley* (1966) 242 Cal.App.2d 124 [51 Cal.Rptr. 131] was a criminal case concerning defendant's "guilty knowledge" that goods he received were stolen.

was issued to the Morgans which did not disclose Bank's interest. Morgans then quickly sold to T & O, who purchased the mobilehome for a bargain price of $7,000 cash, but with no actual knowledge of Bank's security interest. Our Supreme Court held that even though Bank had created constructive notice of its lien by depositing its application with the DMV, thus technically perfecting its security interest, the full title presumption nonetheless prevailed where the certificate of ownership did not reveal the interest. "[A]n examination of the general perfection provisions of the UCC and the special 'full title' registration scheme for security interests in motor vehicles supports the proposition advanced by T & O. The interest of a bona fide purchaser must prevail over a technically perfected security interest which is not disclosed on the vehicle certificate of ownership." (*Id.*, at p. 454.)

 Applying *T & O* to our case, it appears that even if Louis had perfected his security interest in the manner required by the Commercial Code, Miller would take clear title if he had no knowledge in fact of Louis's interest.[13]

The trial court's order, directing that Miller transfer the Mercedes to Louis, necessarily implies a finding that Miller was not a bona fide purchaser. We turn now to the record to determine whether there was any substantial evidence to support such a finding.

*The Evidence*

First, the evidence regarding Cochran's knowledge of the claim against the Mercedes is not relevant for our purposes, except insofar as his knowledge was actually imparted to Miller at the time Miller purchased. Nor can Miller's status be tainted by Cambridge's obvious fraud upon Louis in the course of selling to Cochran. Where a merchant is entrusted with goods "for the purpose of sale, obtaining offers to purchase, locating a buyer, or the like," he can pass clear title even where the sale is accomplished by fraud. (Cal. U. Com. Code, § 2403, subd. (2).)

With the inquiry thus narrowed, the evidence is scant indeed which bears upon the issue of Miller's actual knowledge of Louis's claim. Direct evidence, in the form of Miller's declaration, established he inspected the vehicle, veri-

---

[13]We are certainly not unsympathetic to Louis's plight. Had he submitted a timely and error-free notice to the DMV to establish his rights in the vehicle as against subsequent purchasers, chances are that even this would have availed him nothing, since Cambridge had already applied for a duplicate pink slip before delivering the original to Louis. The statutory scheme simply provides no means of protection for a secured creditor who deals unwittingly with a fraud worker; in fact the ease with which a duplicate ownership certificate can be obtained facilitates the kind of fraud perpetrated by Cambridge here. The Legislature may wish to take note of this problem.

fied that the registration card and pink slip were in the name of Gene Cochran, purchased the car and filed his notice of sale with the DMV, all "without any knowledge of any claims to said automobile by plaintiff or any other person or company." It is undisputed that at the time Miller purchased, the pink slip and registration card both bore the name of Gene Cochran, and no other. ▮ This constitutes prima facie evidence of ownership. (*Getz v. Whisenant* (1949) 93 Cal.App.2d 182, 185 [208 P.2d 708].) **(13b)** Nor can it be contended, in light of *T & O* and the Commercial Code "actual knowledge" standard, that the price Miller paid should have put him on notice; in any event his purchase price was commensurate with what both Syufy and Cochran had paid.

Louis contends that there was evidence of the following to support the conclusion that "Miller knew someone other than Cochran had a superior ownership interest in the Mercedes":

1) Cochran told Miller about the sheriff's attempt to seize the car.

2) Cochran told Perrins of the sheriff's visit.

3) Miller did not have a written contract with Cochran and did not pay a deposit before receiving the car.

4) Miller only got an endorsed *duplicate* pink slip.

5) Miller knew the Mercedes had two different ID numbers.

Points 2, 3 and 4 can be quickly disposed of. Even if there were evidence that Cochran told Perrins, there is none that Perrins told Miller. As Miller did not deal directly with Cochran but only through Perrins, it is hardly surprising that no written agreement was executed between persons who were not contracting with each other, and that no deposit passed from one to the other. And as previously indicated, a duplicate pink slip is a statute-authorized title document and therefore hardly suspicion arousing. And even if these facts were sufficient, which they are not, to put a reasonable person on inquiry, they do not by any stretch of imagination establish actual knowledge on Miller's part of the existence of Louis's security interest.

As to the first and most important point, namely that Cochran had told Miller about the sheriff's attempt to seize the car, the evidence taken from Cochran's deposition is as follows:

"Q. [by Mr. Coward, counsel for Louis] Did you ever tell Mr. Miller about your meeting with the sheriff and the claimed lien on the car?

"Ms. Faber [counsel for Cochran]: When you say "claimed lien" is this your characterization?

"Q. (by Mr. Coward) Did the sheriff tell you there was a lien on the vehicle?

"A. The sheriff told me they were there to seize the vehicle. They then told me that it was my vehicle and I had nothing to worry about and apologized for coming.

"Q. Did you tell Mr. Miller about that meeting or that discussion?

"A. I might have. I don't recall.

"Q. What makes you think you might have?

"A. I don't recall. It was an embarrassing situation. Sheriff come to my house when I had company. They come in, they make a phone call, they apologize for being there, they do a DMV on me or whatever they call it. They said it's a misunderstanding, I'm sorry about the inconvenience. Beyond that, I—just one of those things that happened. Cambridge was in financial trouble. I figured something was involved there.

"Q. My question was did you ever tell Mr. Miller about that discussion?

"A. I don't recall.

"Q. Did you ever tell Mr. Perrin about that meeting or discussion?

"A. I don't recall.

. . . . . . . . . . . . . . . . . . . .

"Q. Can you tell me why you didn't tell Mr. Miller about your meeting with the sheriff?

"Ms. Faber: He didn't say he didn't tell him. He doesn't recall.

"Q. [by Mr. Coward] Did you tell Mr. Perrin about your meeting with the sheriff?

"A. I don't recall.

"Q. I take it by that you don't know whether you discussed or you don't know whether you didn't?

"A. I discussed it with many people in a manner of, can you believe that, the sheriff came to my house and disrupted my household without any prior warning. And then tell me we're very sorry for the misunderstanding which leads me to believe I had everything done properly. As I now find out in retrospect looking back, maybe I should have gone a little further with it.

"Q. Gone a little further with what?

"A. With maybe telling somebody that there was a problem there. But I was unaware of any problem on the car."

In response to the question: "Did you tell Mr. Miller about that meeting?," the answer "I might have," standing alone, could conceivably sustain a finding, but that rejoinder was immediately followed by "I don't recall." Further probing by counsel produced nothing but Cochran's steadfast assertion of total lack of recollection. What he said in effect was: "I have no memory whatever as to whether or not I told Miller, therefore it is possible, as everything is, that I did." No finding can be predicated on the absence of evidence. But even if Miller had been told of the sheriff's visit, no inference may be drawn that he thereby acquired knowledge of the existence of Louis's security interest. In fact, the story would tend to establish the opposite: that the sheriff had proved to his satisfaction, after checking the records, that Cochran was indeed the legal owner. Nor can Cochran's knowledge of the existence of a claim by Louis, as a result of his telephone conversation with Louis's attorney, be imputed to Miller. Cochran testified unequivocally that he did not tell Miller of this conversation.

Finally we come to the matter of the two ID numbers. Here again, we are asked to accept as substantial evidence inference drawn upon inference. The only direct evidence regarding a car with two ID numbers was that of Louis's representative, William Fischer. In October of 1984 Fischer went to Cambridge's showroom and saw a dark blue Mercedes model SEL (not SEC) which bore two different ID numbers, one on the dashboard and one on the door. The number on the door was the same as that on the pink slip endorsed by Syufy. On the other hand, Cochran believed that the number on his pink slip had matched the one visible through the car's windshield.

Even if one assumes that the car Fischer saw was the car here in issue, there is absolutely no evidence that Miller checked Cochran's pink slip against the ID number visible through the windshield or against any ID number on the car. We express no opinion as to whether verifying the vehicle ID number is the usual custom and practice when purchasing a used car. But even if Miller had checked, it is conjectural that he would have formed the conclusion of title defect rather than making another supposition such

as manufacturer's error. We are in the realm of speculation, not evidence. (*Marshall* v. *Parkes, supra,* 181 Cal.App.2d 650, 655.) At best, we may conceivably infer awareness of facts occasioning a raised eyebrow but not knowledge as required by *T & O.*

 Substantial evidence is said to be evidence which has "probative force," which is " ' "such relevant evidence as a reasonable man might accept as adequate to support a conclusion." ' " (*Traxler* v. *Thompson, supra,* 4 Cal.App.3d 278, 285.) The trial court's implied conclusion that Miller had actual knowledge of Louis's claim at the time of his purchase is not supported by substantial evidence.

The order is reversed. Costs of appeal are to be borne by Louis.

Agliano, P. J., and Capaccioli, J., concurred.