Filed 12/30/13  mLogica v. Karan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| mLOGICA, Inc., et al., | |
| Plaintiffs and Respondents, | G047285 |
| v. | (Super. Ct. No. 30-2010-00342873) |
| PANKAJ KARAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James Di Cesare, Judge.  Affirmed.

Catanese & Wells, T. Randolph Catanese and Douglas R. Hume for Defendant and Appellant.

Morris & Stone and Aaron P. Morris for Plaintiffs and Respondents.

\*          \*          \*

# I. INTRODUCTION

All things considered, appellant Dr. Pankaj Karan got off cheaply in the trial court. He appeals from a defamation judgment of $1.23 million when the jury might have awarded plaintiffs mLogica and its owner Amit Okhandiar somewhere between $10 and $20 million. Karan has brought this appeal claiming there was no substantial evidence of causation or amount of damages, but he is mistaken by about $10 million. Maybe more.

As a young software solutions company, mLogica[1] was at a critical juncture. It had gained momentum through a loss leader strategy with industry giants Sybase and IBM and had already profited millions from contracts with the likes of Disney Company and Xerox. Those customers were lost in the wake of a destructive email sent by Karan.

But, as it did in the trial court, serendipity has visited Karan. He has misstated the record in numerous particulars, as shown in a respondents' brief so devastating it has left Karan, like Job, with no reply but silence and a hand over his mouth. It is unusual, to say the least, not to submit a reply brief when you've written an opening brief that exceeds 55 pages, but that is the situation here. Yet mLogica and Okhandiar have not asked for sanctions for what appears to come perilously close to an attempt to mislead this court.

---

[1] It is not uncommon in the software industry to begin proper names with lower case letters. It looks ugly but we honor the convention anyway – "mLogica" it is.

## II. FACTS

### A. *The Defamation*

Dr. Pankaj Karan wanted to open a call center in Pune, India to assist medical doctors in handling patient calls. Karan did not want off-the-shelf software because of the cost of the ongoing license fees for such products. So he entered into two contracts with Computech India – one for call center facilities, the other for Customer Relationship Manager (CRM) software. Amit Okhandiar owned both Computech and U.S.-based mLogica, but mLogica did not enter into this contract, and could not have, since such software creation in the U.S. would have been too expensive for the price Karan wanted to pay. However, since Karan was a childhood friend of Okhandiar, mLogica did assign some of its employees to the software project. Computech and mLogica delivered the software on time in the summer of 2008.

The relationship between Karan and Okhandiar deteriorated. Karan demanded over 100 changes to the software after its delivery. He delayed payment to third party software engineers working with Computech in India to integrate the software with the Internet. He refused to cooperate in the bug testing process.

Karan directed much of his anger at his former friend, Okhandiar. This anger is perhaps best illustrated by his creation and use of the email address amitchutia@gmail.com. Chutia (sometimes "cutiya") is an insult in Hindi, meaning (at its mildest) pimp or fool. (Platts Dict. of Urdu, Classical Hindi, and English (1884) p. 449.)[2] And, in December 2008, as if to adumbrate the email that would lead to the judgment in this case, Karan sent emails to Okhandiar and mLogica stating that he would "work night and day to inflict the maximum amount of financial pain that is allowed under the law," and Okhandiar would have to "pay in spades" when he was done.

The bug testing phase of the software finished in early January 2009, and

---

[2]     http://dsalsrv02.uchicago.edu/cgi-bin/philologic/contextualize.pl?p.3.platts.1426304 [as of Dec. 5, 2013].

Karan made no further change requests.  Nonetheless, in March 2009, Karan sent a demand for money to Okhandiar and a number of others at mLogica.  The demand claimed mLogica had failed to deliver any product, and if Karan did not get the full $51,660 he paid for the software within five business days, he would sue and demand $350,000 in punitive damages.[3]

At some point after April 2009, Karan obtained a stolen list containing 200 email addresses of mLogica's clients and partner corporations.  The email list was for a client of mLogica's on a secure server in Orange County managed by Xerox to which even Okhandiar did not have access.  Karan admitted he got the list from a server he picked up from the mLogica client.[4]

Finally, on January 25, 2010, at 2:22 a.m., Karan made good on his threat to inflict pain on mLogica and Okhandiar.  In an email to their customer list, the most important of which was Sybase, Karan stated Okhandiar had, while employed at Sybase, siphoned off work and customers for himself.  Further, Karan stated he had contracted with Okhandiar for software but Okhandiar failed to deliver any of it.[5]

---

[3]     Ironically, the call center did not even require CRM software.  Karan wanted custom software to avoid future licensing fees, since he thought his call centers would take off.  However, when his first call center went live in January 2009 only about 20 to 30 doctors signed up, although it would have required 100 subscribers to make the CRM software of any benefit.  Not surprisingly, the call center quickly stopped doing business.

[4]     The record is not precisely clear how the email list got from mLogica to Karan, though Karan admitted he picked up a server with the list on it.

[5]     For reader convenience, we reproduce the email in full:

The email further included a link to Karan's own blog. The blog stated Okhandiar did not pay his vendors and, that Okhandiar "lured me into giving business to him for CRM development and then failed to deliver it. . . . [¶] He cheated me of 65k and that led to a total loss of 400k for my start up business in Pune, India."

None of these accusations were true, and – we emphasize – Karan conspicuously does not argue to the contrary in this appeal.

B. *The Damages*

Sybase was mLogica's largest client and critical to mLogica's relationships with other companies in two ways. mLogica profited from the sale of a Sybase appliance, the extremely fast-processing data warehousing [a]ppliance, which sold at $250,000 to $1 million apiece, and from their maintenance contracts. By early 2010, mLogica had already realized $2.3 million in profits in connection with five expensive Sybase appliances.

---

"As a former client of mLogica I feel that I have an obligation to advise other associates of Amit Okhandiar (CEO and Founder of mLogica) of his unscrupulous, unethical and illegal business conduct. On the onset you should know that I am a well established physician in the Los Angeles area and have known Amit Okhandiar for nearly 30 years. I regret having to write and take up your valuable time but I believe that the details in this email will be worth your personal and business interest. [¶] The underpinning of mLogica's business has been its association with Sybase. I have confirmed that during Mr. Okhandiar's employment with Sybase he opened two companies – NetVision and Iverest. While VP of Business Development at Sybase he funneled work to his own business which was a violation of his employment. I am positive that Sybase must have suspected something but could not pinpoint anything because the companies in question were in the name of extended family members and close business associates (i.e., Nadeem Shafi and Anshuman Sinha). He built his company on the side and when he gave it enough work he quit Sybase. Of course he could not go to work for NetVision or Iverest since that would raise a red flag. Rather, he opened another company – mLogica – to throw off any suspicion by his contacts at Sybase. By the way, vendors who worked at NetVision were never paid and the company was closed. From my understanding, Iverest is still open but is on shaky ground. [¶] It never occurred to me that this person who could hoodwink Sybase and get money from them on the side would ever cheat me. I approached him in 2008 to develop a CRM for me for a call center in India. I paid him $65,000.00 and he never delivered a product. His purposeful delay caused me and my investors to lose $400,000.00. I have paid for software in full on another project and he refuses to give the source codes. Every step of the way, this man knows only how to cheat others and siphon money for his own greed. My painful experience leads me to advise you to stay away from doing any business with his companies. You stand a high chance of being cheated out of your money. [¶] I welcome the opportunity to correspond with any of you and share whatever information I have. In the meantime please feel free to look at my blog which will be continuously updated on the business failings and cheating of this company."

But after Karan's email, Sybase terminated two major contracts with mLogica. A few days later, a subsidiary of Sybase, iAnywhere Solutions, gave notice it, too, would not be renewing its contract with mLogica. In May 2010, the Sybase product manager emailed Okhandiar, stating, "Sybase cannot continue any projects with mLogica as per corporate guidance." mLogica lost all work with Sybase, and, to make matters worse, Sybase refused all further communication with mLogica. At that point, mLogica began to hemorrhage other clients.

At trial in this case, Daniel Goitein, a former employee of Sybase, estimated mLogica had a "pipeline" of $15 to $20 million with Sybase alone before the email. mLogica presented evidence of its business model, which employed a loss leading strategy frequently used in the software industry. Initially, mLogica was willing to realize and reinvest minimal profits while pushing its intelligence solutions and resources to industry leaders; once those relationships were established, mLogica would have access to their large preexisting client base. At that turning point, mLogica's minimal profits or even losses would convert to a quickly burgeoning profit stream. Evidence of that business model, and mLogica's position at such a turning point, was presented to the jury.

mLogica further presented expert testimony that the company had lost $26 million in total revenue (both prior to trial and anticipated for the next three years). This $26 million would have amounted to about $9.5 million in lost profits, and when reduced to present value at the time of trial (because some of those profits were anticipated in the future), equaled $7.68 million. The jury awarded mLogica and Okhandiar each $1.23

6

million in damages for lost profits.[6]  On June 15, 2012, the trial court entered judgment, with the proviso that there was to be no duplication of the $1.23 million award -- $1.23 million was the maximum that could be recovered.  On August 2, 2012, it denied Karan's motion for a judgment notwithstanding the verdict, finding much evidence to support the judgment.  The time to appeal was thereby extended, making Karan's notice of appeal on August 10, 2012, timely.  (Cal. Rules of Court, rule 8.108(d)(1).)

## III.  DISCUSSION

As noted, Karan does not challenge the jury's finding he defamed both mLogica and Okhandiar.  He confines his appeal to two aspects of one problem – causation.  He argues the damages were speculative because mLogica's future economic profits were not probable, and concomitantly his email really didn't *cause* mLogica to sustain any lost profits.

The issue is one of substantial evidence.  A special damages award is proper where based on evidence showing a probability of net profits being realized from existing economic relationships, and certainty as to amount is not required.  (See *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 287-288.)  Moreover, causation can be logically inferred from a chain of events.  (See *Louis & Diederich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584, 1592.)  There are times when a trier of fact may use its common sense to draw an obvious connection

---

[6]  Amit Okhandiar was awarded $492,000 in past economic damages, $738,000 in future economic damages, $172,000 for reputational damage, $1 in assumed damages, and $110,000 in punitive damages.  The jury also awarded mLogica $1,230,000 in damages: $492,000 in past economic damages, $738,000 in future economic damages, and $1 in assumed damages.  The final judgment issued one award of $1.23 million to mLogica and Okhandiar jointly and severally, since Okhandiar was the sole shareholder of mLogica, as well as $172,000 to Okhandiar for loss of reputation and $110,000 in punitive damages, and an additional $50,000 to mLogica for loss of reputation.

based on the propinquity of events to establish a cause and effect relationship. (*County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 67.)[7]

The evidence concerning the loss of the business in the pipeline with Sybase alone would completely justify the verdict. Above and beyond that, mLogica lost business with no less than 20 companies. These included such well-known companies with enormous appetites for information processing as Disney, Abbot Laboratories and Xerox.[8] At the time of the email, even premised on a conservative estimate, mLogica expected over $26.2 million in anticipated revenue in the pipeline to materialize over the next three years.

Rather than list the evidence from all 20 companies, we will confine ourselves to only another 12 beyond Disney, Abbott Laboratories and Xerox (and even then in a footnote).[9] Suffice to say the evidence was abundant.

_____

[7] As Justice Yegan noted in *County of Kern*, the phrase "[p]ost hoc, ergo propter hoc" is a logical fallacy because "the propinquity of two events does not necessarily establish cause and effect." But, as he then goes on to point out, it is only a fallacy because of the term "necessarily"; juries are always able to consider timing and proximity in assessing causation. (*Id.* at p. 73; accord, *Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1570 [evidence allowed jury to draw "reasonable inferences based upon timing and proximity"].)

[8] To wit:

*Disney*: mLogica vice-president Peter Burney testified Disney projects usually went to the incumbents, i.e., the companies that were currently working on the project. mLogica had performed well on two initial projects for $750,000 and stood as the incumbent for both projects to be renewed at $350,000 each. But after Karan's email, Disney departed from its usual practice and didn't renew the contracts; in fact, mLogica was removed from Disney's preferred vendor list.

*Abbott Laboratories*: There was testimony that Abbott Laboratories typically entered into two-year contracts with mLogica for data migration projects, but after Karan's email, mLogica received no more contracts and "communication stopped."

*Xerox*: Before Karan's email, ACS Affiliated Computer Services, since acquired by Xerox, brought in $7.7 million in revenue to mLogica, with 24 to 32 mLogica employees working on ACS projects.

[9] (1) *Actuate*: Vice-President Burney projected additional lost profits from a smaller company, Actuate, which had worked with mLogica and sought to increase its business to $1 million until receiving Karan's email.

(2) *FuzzyLogix*: Burney also testified to a new customer, FuzzyLogix, whose base line predictive model needs alone, at $20,000 each, would bring in $3.2 million in the next two years.

(3) *Mobility Group*: mLogica was poised to reap a significant license percentage from Sybase's sale of Mobility Group for $3 to $5 million, but this failed to materialize after January 2010.

(4) *GE Medical*: mLogica presented testimony that GE Medical was looking to mLogica for small two-core analytic solutions for $250,000. The project, in the "initial stages of the pipeline," no longer had effect after January 2010.

(5) *Smart Health* would no longer move to mLogica's intelligence solutions for $50,000.

(6) *Ronin Capital* stopped pursuing a new contract with mLogica for general database, development, and managed services for a yearly contract at $180,000.

Even if one looks only to direct evidence of causation, it is copious. The jury heard evidence that by mid-March of 2010, a major client of Sybase, Medimpact, refused to work with mLogica because of "concern at higher levels" about "the unfortunate incident," referring to Karan's emails and blogs. The abandoned deal would have brought mLogica $750,000 for software, $500,000 for a development server, and $250,000 for supplemental implementation.

mLogica witnesses also testified to a direct and indirect impact of Karan's email on mLogica's relationship with IBM. First, the email went to IBM directly, and mLogica lost over $3.5 million in direct revenue from IBM. Second, IBM testified it could no longer promote mLogica after the email had gone "viral," and thus mLogica could no longer re-sell IBM hardware, servers, P-series servers and DS-3400S storage units. For instance, mLogica had sold MCN one IBM-based analytic solution for $72,000 and was selling another for an estimated $100,000, but "they [MCN] stopped entertaining us after the incident." Another IBM reseller, Logicalis, paid mLogica over $500,000 for development services with at least another $100,000 in the works, but, as Burney testified, after the email "it stopped."

Even further, Peter Burney testified Sybase was also negotiating to transition to mLogica contracts with American Image Management (AIM) for roughly $4 million and T. Rowe Price for roughly $11 million. And Daniel Goiten from Sybase

---

(7) *Ticket Master* "didn't entertain" mLogica after the email, even though mLogica had been negotiating to manage their servers and software for $1 million in revenue.

(8) *Infospace*: Negotiations similarly fell through on a $100,000 deal with Infospace.

(9) *BSG Global*: mLogica was working on a $150,000 consulting agreement with mLogica but would no longer respond to their communications.

(10) *Microstrategy*: A deal with Microstrategy for IBM operating systems at $2.9 million inexplicably did not go through.

(11) *C&M (Chouinard)*: This company, another IBM hardware reseller, stopped discussing bringing three to five clients to mLogica at $250,000 for each appliance, a minimum of $750,000 in revenue.

(12) *Think ASG*, another IBM hardware reseller, was negotiating a contract for mLogica to sell to Think ASG's customer base for a minimum of $750,000 in initial profits, but the relationship soured in the aftermath of Karan's email.

testified the AIM and T. Rowe Price deals fell through because Sybase instructed the companies not to work with mLogica.

When Burney was asked at trial if he was speculating about mLogica's pipeline, he responded, "I've been doing this for a long time. When I look at a pipeline, I have a very clear understanding as to the level or the degree that I think I can close business. . . . [¶] . . . [¶] . . . [T]he pipeline between mLogica, Sybase, and IBM was well over a hundred opportunities. . . . [We've] not speculated on anything. What we've done is taken actual opportunities [as] they go through the sales cycle. And I feel very comfortable, extremely comfortable that a high percentage [as high as 80%] of these opportunities would have been closed." As to the IBM-related customers with whom mLogica was developing relationships, Burney noted that IBM's gravitas played a key role: IBM was the "800-pound gorilla in the room. They put together programs and people buy them."

All of the above entities had existing or beginning economic relationships with mLogica, and were indisputably exposed to the email. mLogica experienced a disruption of these relationships, such as not being renewed as a preferred vendor with Disney and losing all ability to communicate with Sybase or IBM or sell their products. As Daniel Goiten, a former Sybase employee, testified, Sybase would not have canceled its contract without the email. A number of sources directly stated they pulled back in business dealings with mLogica because of the email.

Indeed, there is nothing but Karan's 2:22 a.m. email stab at mLogica's heart – its customer list – to explain mLogica's drastic transition from a company capitalizing on its partnership with software industry leaders in early 2010 to being shut out of the relationship-driven industry by mid-2010. Given Karan's childhood relationship with Okhandiar, it was the unkindest cut of all.

10

## IV.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal. We would remind counsel for Karan to, in the future, to take more care with the appellate record.[10]  Karan's luck, however holds.  Thanks to mLogica and Okhandiar's commendable forebearance, there has been no request for sanctions in this appeal.


                                                          BEDSWORTH, ACTING P. J.

WE CONCUR:



MOORE, J.



FYBEL, J.

---

[10]     Here are some of the Karan's misstatements:

(1)  The opening brief says Karan's investors put $500,000 into his company, and this was spent on staffing, office expenses, and the software central to this case.  On the contrary, the record indicates more than half that money was spent on his wife's business-class trips to India and lengthy five-star hotel stays, and Karan's car payments.

(2)  Karan claims mLogica's software was late because the contract specified it was to be delivered within 40 business days and it was not delivered before July 29, 2008.  However, as respondents' brief points out, and a quick trip to india.gov.in/calendar (the "National Portal of India") verifies, the many Indian holidays would indeed extend the software deadline to mid-August, making its delivery timely, even according to the 40-day timeline indicated as "best case scenario" in the contract.

(3)  The opening brief alleges Karan demonstrated "patience and continued good faith efforts to obtain the software," but as already indicated in the fact statement above, Karan was impossible to deal with for nearly all involved.  Even a charitable read of his profanity-laced emails to mLogica staff does not evince a patient Karan or good faith efforts on his part to do anything but escalate conflict.

(4)  The opening brief states mLogica's expert "*admitted that any damages claimed by MLOGICA or AMIT were 'speculative,'. . . .*"  There is no citation to the record, however, and a search of the record reveals no place where mLogica's expert said the word speculative or any derivation of, or synonym to it.  Instead, as noted below, mLogica vice-president Peter Burney stated explicitly that they had "not speculated on anything. What we've done is taken actual opportunities [as] they go through the sales cycle."

(5)  Karan states that the IBM witness Rick Smith "could not identify any dollar amount of business in the so-called 'pipeline' between MLOGICA and IBM."  Here, Karan actually cites to the record, but excises the part where Smith testifies that as IBM is broken into three segments, he could only testify to the impact of Karan's email on his segment.  Smith still goes on to say, however, that just within his "sphere of influence, it was a six figure number.  But I can't give you an actual dollars and cents because it's a pipeline which means it's an estimate."  While Smith did not specify an exact amount, his estimate that it was at least over $100,000 is certainly not the same as being unable to identify *any* dollar amount in the pipeline.